GRACIE *against* THE NEW-YORK INSURANCE
COMPANY.

THIS was an action on an *open* policy of insurance, dated the 24th of *January*, 1807, upon the cargo on board the ship *Vermont*, at and from *New-York* to *Leghorn*. The policy contained a " written clause, warranted not to abandon, if captured, until condemned, or until after a detention of six months, after advice received here of the capture."

*Insurance on goods, from N. York to Leghorn. The vessel and cargo were captured by the French, and carried into Ferrajo. The ship and cargo were proceeded against by the captors, in the council of prizes at Paris, which court decided that the capture was illegal, and ordered a restitution of the property, with costs and charges. The captors appealed to the council of state, and by arrangement between them and the consignees, the property was delivered to the consignees, on their giving a bond to the amount of the appraised value of the property, to abide the determination of the appeal. The property was appraised at 50 per cent. above the prime cost,* and a bond given for the amount, which was greater than the sum insured. The cargo was taken to *Leghorn*, and there sold by the consignees, at an *advance* beyond the amount at which it was so appraised.

At the trial, the plaintiff proved an interest in the cargo insured, to the amount covered by the policy, and no more. The ship sailed the 30th of *January*, 1807, and was captured, during her voyage, by a *French* privateer, and carried into *Porto Ferrajo*. The ship and cargo were proceeded against by the captors, in the *council of prizes*, at *Paris;* and, upon the trial, the council of prizes decided, that the capture of the *American* ship *Vermont*, by the *French* privateer *Napoleon*, was null and illegal, and that both ship and cargo should be restored to the proprietors; and it accordingly ordered restoration to be made to the proprietors, discharging them from any bond or obligation that they might have given for the provisional delivery of the cargo, and condemning the owner of the privateer in all costs and charges,

The *council of state* reversed the decree of the *council of prizes;* and on reference of the decision of the *council of state* to the *emperor of France*, he confirmed the sentence, and declared the ship and cargo to be good and lawful prize.

The consignees having been compelled to pay the bond, the insured brought an action on the policy, for the amount insured. It was held that the insured was not bound to *abandon* for a total loss, but might recover the amount paid on the bond, or as much as was covered by the insurance, as a partial loss. The *spes recuperandi*, in such a case, is not the subject of *r*bandonment, for its value cannot be computed by a jury.

But there can be no *spes recuperandi*, where the sentence of condemnation has been affirmed, in the *last resort*, or by the definitive sentence of the highest tribunal of the country.

&c. It appeared also, that the captors appealed from the sentence of the *council of prizes*, to the *council of state;* that upon entering the appeal, an arrangement was made by the consignees of the cargo, by which the cargo was delivered to them upon their executing *bonds*, with sufficient security, for the value of the cargo, to be fixed by appraisement, to abide the determination of the appeal. In consequence of this arrangement, the consignees of that part of the cargo which belonged to the plaintiff, gave a bond for the appraised value of the cargo, to abide the event of the appeal; and the cargo was thereupon delivered to them. It was appraised at about fifty *per cent.* advance upon the prime cost, and above the sum covered by the policy.

On the 29th of *May*, 1808, the *council of state*, after hearing the appeal, decreed as follows: " Considering that it is proved that the imperial decree of the 21st of *November*, 1806, might have been public in the *United States*, at the time of the departure of the ship *Vermont;* that in consequence, that decree is applicable to the said ship; considering, besides, that it results from the nature of the cargo, that a part of the goods on board are of *English* growth or manufacture, we decree that the decision of our imperial council of prizes, at *Paris*, of the 2d *September*, 1807, which declares the capture of the *American* ship *Vermont* to be illegal, and that the ship and cargo be restored to the proprietors, is hereby annulled and reversed." On the 27th of *October*, 1808, the *emperor of France* issued the following sentence : " On the report of our grand judge tending to obtain the interpretation of our decree of the 29th of *May* last, which annuls the decision of our council of prizes in the case of the *Vermont* and her cargo; having examined the said decree, and that of the 21st of *November*, 1806, and considering that the decree of the 21st of *November*, 1806, is applicable to the present case, we declare that the said

ship *Vermont* and her cargo, are good and lawful prize."

Under this final sentence and decree, the consignees of the cargo were compelled to pay the *amount of their bond*, given for the appraised value of the cargo, as above mentioned. The cargo was taken to its port of destination, by the consignees, and there sold *at an advance upon the amount at which it had been appraised*, and delivered to them.

The plaintiff gave to the defendants, from time to time, all the information which he received relative to the subject matter of the insurance. On or about the 14th of *July*, 1810, the plaintiff informed the defendants, that he had received the documents relative to the capture of the *Vermont* and cargo, the first trial and sentence, the appeal and second sentence of reversal, and the bond and delivery of the cargo to the consignees' and called on them to pay the full amount insured, but at the same time expressed to them that it was not his intention to abandon to them the property in the hands of the consignees; but to give them such a power as might be necessary to prosecute their claim on the captors or the *French* government for illegal condemnation. Copies of the proceedings, &c. were delivered to the defendants, who offered to accept an abandonment, and pay a total loss; but declined paying the full amount insured, unless there was an abandonment.

On the 6th of *July*, the plaintiff wrote to the defendants, as follows : " I send you herewith invoice and bill of lading of 107 boxes of *Havanna* sugars, shipped in the ship *Vermont* for *Leghorn*, upon which I effected at your office 4,500 dollars insurance, policy dated 24th *January*, 1807, which property having been condemned by the *French* emperor, I now call on you for payment of a total loss." The defendants answered, on the 9th *July*, 1810, that they were willing to accept of the abandon-

ALBANY,
August, 1811.

GRACIE
v.
NEW-YORK
INS. Co.

ment made of the property insured, and that whenever the necessary abandonment and assignment were completed, they would pay a total loss; and at the same time requested information as to the disposition of the property by the consignees, &c. On the 12th of *July*, 1810, the plaintiff wrote to the defendants, as follows: " I find that your company have entirely misunderstood the meaning of my letter of the 6th instant, to which yours is an answer. I never intended to make any abandonment of the cargo of the *Vermont* to the company, nor does my letter contain any offer to do so. My claim is for a partial loss, which being greater in amount than what was insured by your company, I understood the term *total loss* to denote the *amount* of my claim, but by no means the nature of it. I claim from your office the amount of what my consignees were obliged to pay to obtain possession of the cargo, or so much of it as is covered by your policy."

To this letter the president of the company answered the next day: " The company consider the rights of the parties as fixed by your letter of the 6th of *July* instant, being an abandonment of the property, and their acceptance thereof by their letter of the 9th *July* instant. I can only say, the company repeat their readiness to pay you as for a total loss, and to receive from you a formal assignment of the property."

A verdict was found for the plaintiff, for the whole sum mentioned in the policy, subject to the opinion of the court on a case containing the above facts.

*D. B. Ogden* and *Boyd*, for the plaintiff. This case is new, and must be governed by the principles of the law of insurance, as there is no express adjudication in point. The insurers undertake that the property shall arrive at its port of destination, in safety, and that they will pay

all the expenses, costs and charges incurred, by necessity, or in consequence of the perils insured against, in order to get the property to its destined port.

ALBANY,
August, 1811.

GRACIE
v.
NEW-YORK
INS. CO.

In *Berens v. Rucker*,* the insurers were held liable to pay the expenses of a compromise, *bona fide* made, to prevent the ship from being condemned as lawful prize, or to avoid a greater expense; and Lord *Mansfield*, in that case, observed, that the question was, whether the insured " acted *bona fide*, and uprightly, as men acting for themselves, and upon a reasonable footing; and it made no difference though the sentence was unjustifiable." It is on this principle that the cases of *ransom* proceeded, in *England*, until the practice of ransoming ships was prohibited by the statute of 22 *Geo*. III. c. 25. In the case of *Vandenheuvel* v. *The United Insurance Company*,† where a sum of money was paid by way of ransom, to prevent an appeal and avoid further detention, after the sentence of the admiralty court, the insurers were held liable.

* 1 *Wm. Bl. Rep.* 313.

† 1 *Johns. Rep.* 406.

The only difference between that case and the present is, that in the former, the insurer paid the money; and in the present, a bond was given for the ransom or release of the property; but the bond was more advantageous to the insurers, as it gave them a chance of a release from the payment, on an appeal. The mere giving the bond cannot vary the application of the principle of that decision.

But it will be said, that here was a technical total loss, and the insured must abandon, before he can call on the insurers for payment. It is true, if the insured does not abandon, he can only recover for a partial loss. It is optional with him, whether he will abandon or not, on receiving advice of capture. If he does not choose to abandon, he may take the chance of a release of his property, and call on the insurers to indemnify him for the loss actually sustained. " In every case of capture, the insurer is answerable to the extent of the sum insured, for the loss

ALBANY,
August, 1811.

GRACIE
v.
NEW-YORK
INS. CO.

* *Marsh. on Ins.* 495.

† 1 *Esp. Cas.* 237.

actually sustained," which may be either *total* or *par-tial.**

In *M'Masters* v. *Shoolbred*,† Lord *Kenyon* held, that though the insured might have abandoned, on the capture, and so have made it a total loss; but not having abandoned in the first instance, and having recovered the ship, (by purchase, under a sale by the captors,) he was bound to go for an average loss only.

Suppose the goods had been valued at less than the cost, and had been sold at a loss, and the plaintiff had abandoned and claimed a total loss, would not the defendants have said, " you have got your property on paying a certain sum, and that we are willing to pay and no more?" Besides, after the lapse of time which had taken place, the plaintiff had no right to abandon; and the insured might justly object and say, " you come too late to claim a total loss, after waiting until the property reached *Leghorn*, and had been there more than 12 months."

If the plaintiff, after condemnation, had purchased the goods, he could not recover from the insurer more than he paid for their release. The money thus paid is considered as *salvage*, and if the voyage can be prosecu-

‡ *Marsh. on Ins.* 581.

ted, it is only a partial loss.‡

Then, as to the alleged abandonment, we contend, that on the fair construction of the letters of the plaintiff, there was no abandonment, in fact, made.

*Hoffman* and *T. A. Emmet*, contra. If no decision of this question is to be found in the books, it is because this is the first time such a demand was ever made. On the first view of it, there appears something wrong and unreasonable in the claim of the plaintiff. If the property had been sunk in the sea, he could claim no more than the sum insured. Here the plaintiff, besides the amount insured, gets a profit of 120 *per cent.* If he

can keep the property, and recover the full amount insu-
red, there can be no inducement to abandon in case of
capture and condemnation. By giving a bond, or paying
a compromise, he keeps the property, and recovers to the
amount insured; and it can make no difference to the
insured, at what rate he ransoms or compromises, if it
does not exceed the sum insured. Such a doctrine must
open the door to great fraud and injustice.

The cases cited were those of a *salvage*, ransom or
purchase which were made to prevent a condemnation:
Here the plaintiff's claim is founded on the condemna-
tion. The bond is given as a substitute for the goods.
It has no legal efficacy or effect, until after a condemna-
tion. It cannot be considered in the light of a purchase
until the property has been condemned. The plaintiff
cannot claim of the defendants the price of the goods,
until he has transferred the goods to them. If this is a
case of abandonment, the defendants are entitled to the
profits, or they must bear the loss on the goods.

In case of an illegal capture, there is always a *spes
recuperandi*. Can the insured recover the whole amount
insured, and keep the *spes recuperandi* for his own bene-
fit? *Park** says, that before the insured can demand a
recompense from the underwriter, for a total loss, he
must abandon to him his right to all the property that
may chance to be recovered from shipwreck, capture, or
any other peril, stated in the policy. And this abandon-
ment must be total, not partial; one part of the property
cannot be retained, and the other abandoned.

Again, by the sale of the goods at *Leghorn*, the port of
destination, the voyage and risk ended. A condemna-
tion, afterwards, is not within the policy; for it could not
affect the goods, but merely the bond given for them.
Then no loss has happened on the goods during the con-
tinuance of the risk, or the existence of the policy.

Again, here was an abandonment and an acceptance
of it, which fixed the rights of the parties. A formal

ALBANY,
August, 1811.

GRACIE
v.
NEW-YORK
INS. Co.

* *Park on Ins.*
(6th edit.) 193.

transfer is not requisite, until the money is paid. If the plaintiff intended to claim for a partial loss, there was no necessity to send such a letter, accompanied with the invoice, and bills of lading. A demand of payment for a total loss, where such loss is technical, does, *ex vi termini*, include an abandonment. Had the plaintiff chosen to insist on a total loss, would not his letter of the 6th *July*, have been sufficient evidence of an abandonment? The explanation afterwards given, was not made until three days after the receipt of the answer of the defendants.

KENT, Ch. J. delivered the opinion of the court. The plaintiff refused to abandon to the defendants the proceeds of the cargo at *Leghorn*, and claims the amount of the bond which he was obliged to give, and since to pay, on receiving back the cargo in *France*. His claim is equal, and even superior in amount, to what it would have been, if the property had perished; for the bond was for a sum equal to fifty *per cent.* advance upon the prime cost. The whole difficulty in this case arises from the refusal to abandon; for there cannot be a doubt, upon the correspondence between the parties, that no such abandonment was made.

There were two subjects to which the abandonment might apply, viz. the hope of ultimate compensation from the *French* government, and the proceeds of the cargo at the port of destination.

All the books agree that the assured is never obliged to abandon; and if he does not, he is always entitled to recover to the extent of his loss. The object of abandonment is to turn that into a total loss which otherwise would not be so. But here the loss is equal to a total loss, and the plaintiff must recover the amount of the bond, (at least as far as the subscription covers it,) or nothing at all, for there is no rule by which the damages

can be estimated at any less sum. To attempt to ascer- tain the value of the *spes recuperandi*, as it respects the claim on the *French* government, and to deduct that va- lue from the recovery, appears to me to be useless. I cannot assent to what was said upon this point in the case of *Watson & Paul* v. *The Insurance Company of N. A.* (1 *Binney*, 47.) for a jury is wholly incompetent to calculate that value. There is no possible rule of com- putation. Where any part of the property exists *in spe- cie*, a jury may have a rule to go by; as when a vessel is stranded, and is still alive; but it would be perfectly arbitrary to undertake to estimate the worth of such a hope, in this case. If that hope does legally exist, so that it can be judicially regarded, the plaintiff ought to renounce it in favour of the insurer, or not recover at all. But there is no existing hope of recovery in this case. The law had pronounced a definitive sentence in the highest tribunal. The condemnation was affirmed in the *last resort*, by the emperor himself, and any chance of reimbursement under that sentence must be the result of future negotiations between the two governments, and that is a subject totally unfit for the investigation of a jury. No court is competent to act upon such specula- tions. And if *France* should, at any future period, agree to, and actually make compensation for the capture and condemnation in question, the government of the *United States*, to whom the compensation would, in the first instance, be payable, would become trustee for the party having the equitable title to the reimbursement, and this would clearly be the defendants, if they should pay the amount of the bond. There would be no doubt of their claim in equity; and the case shows that the plain- tiff offered to give them the requisite authority to assert this claim upon the *French* government. But all this was useless. No individual could prosecute this claim. There was no further appeal left. There was no legal redress

remaining, in contemplation of law, and, therefore, there was no *spes recuperandi* existing, or none which could be the subject of liquidation.

An abandonment, then, as to this point, would have been as idle as if the property had perished at sea. It is settled, that if a total loss actually exists, the assured may recover as for a total loss, without abandonment. To make an abandonment when there is nothing to abandon, is absurd.

The case then comes to this, whether the plaintiff cannot recover the amount of his loss, without abandoning the proceeds at *Leghorn*. If he cannot, he must either be content to bear the heavy loss of the amount of the bond, or content himself with the prime cost and charges, and suffer the insurer to reap the gain and profit of the voyage. Neither alternative is within the spirit or equity of the contract. The insurer has nothing to do with these proceeds any more than he would have, if the vessel had been robbed on the voyage of part of her cargo, or the captain had been compelled to ransom the vessel from pirates. He is bound to save harmless the assured from such intermediate loss. If the plaintiff recovers the amount of the bond, he is only indemnified, and is placed in the same situation, as if the peril had not intervened. If the intervening peril had produced a loss of less than the prime cost; say, for instance, a loss of 60 *per cent.* there would have been no difficulty about the recovery; for that was the case in *M'Masters* v. *Shoolbred.* (1 *Esp. N. P.* 237.) In that case, there was a capture and repurchase, and no abandonment; and Lord *Kenyon* ruled, that the plaintiff was entitled to his indemnity, as in the case of a ransom, which was the sum paid for the repurchase of the ship and the expenses, amounting to an average loss of 60 *per cent.* So it was said by Lord *Mansfield,* in the case of *Goss* v. *Withers,* that if, after condemnation, the owner recovers the ship captured, but has paid salvage, or been at any expense

in getting her back, the insurer must bear the loss ac-
tually sustained. Whether the amount of the ransom, or
salvage, or repurchase, in these cases, falls short or goes
beyond the prime cost of the subject, does not alter the
principle, nor affect the question of abandonment. The
assured receives no more than his indemnity, by being re-
imbursed the sum he has paid. The voyage goes on,
and becomes a matter of profit or loss, precisely as if the
peril had not happened. I do not perceive any principle
that requires the assured to abandon the property so re-
claimed, when the amount of the money paid exceeds the
prime cost of the article, and which does not require it
when the amount is less. He is only to abandon when he
goes for the whole subject as lost, and part of it remains,
or the hope of its recovery exists. He is not to make a pro-
fit of the insurance. He is not to be paid for the whole
subject while he retains part, or is supposed to be capa-
ble of recovering part. He shall recover only as for an
average loss, provided it be a case susceptible of com-
putation as an average loss. But in this case, he asks only
for the money he has been obliged to pay. He cannot
possibly make the insurance lucrative. He asks only to
be indemnified from the peril; and whether the property
recovered went to a rising or falling market, is a ques-
tion not belonging to the case. That event remains the
same as if there had been no capture. If property be
ransomed from pirates or enemies, or recovered from
shipwreck, at a loss of 60 *per cent.* the remainder may
possibly go to a market which will render the voyage
profitable, even if there had been no insurance, and the
expense incurred was a dead loss. So the voyage may
be ruinous, if only one *per cent.* be taken away by a peril,
and that one *per cent.* be insured. The insurer, in a case
like this, has nothing to do with these results. He must
return the money which the assured has been obliged to

pay, in consequence of a peril, provided it was fairly and *bona fide* paid, and does not exceed the amount of his subscription.

I am aware that the *French* law of insurance is different, as the *ordinance of the marine* has a particular and very equitable provision on this subject. If the insurer, under that ordinance, be called upon to pay the amount of a ransom or composition, he is entitled to take the profit of it, by becoming proprietor of a portion of the effects redeemed, in a ratio to the amount of his subscription. (*Ord. des Assurances*, art. 67, 68. 1 *Emerig.* 467. 472.) But the *English* rule is otherwise. The insurer must pay the amount of the composition, if it be reasonable and *bona fide*, without being entitled to any interest in the proceeds. This not only appears from the cases already referred to, but from the decision in *Berens* v. *Rucker*, (1 *Black. Rep.* 313. *Park*, 89. 6th edit.) which has always been regarded as good law.

Nor is the assured, in this case, to be limited to the prime cost of the subject. That is only resorted to when it becomes necessary to ascertain the value of the subject insured, or what is the same thing, the amount of the loss. It is a rule of computation which ceases when the parties have fixed the value, or it can be ascertained (as in this case) by another and more obvious rule, viz. the sum actually paid. The latter is in this case the just and *certain* test of the amount of the loss, and I do not know of any decision or principle which forbids us to resort to it.

The court are accordingly of opinion, that the plaintiff is entitled to judgment for the amount of the verdict.

Judgment for the plaintiff.