Tilghmak C. J.
These three causes depending very much on the same principles, I shall consider them together. Bohlen’s case was a capture by a French privateer, and condemnation by a French tribunal at Paris, although the ship was carried into Amsterdam. In the two other cases the ships reached their port of destination, Antwerp, where the cargoes were sequestered, and finally sold by order of the Emperor of France, without trial or final condemnation. Two questions have been submitted to the opinion of the Court. 1st. Whether, under the circumstances of the case, the plaintiffs abandoned in due time? 2d. If they did not, then *417 whether they are entitled to recover, deducting the value of the spes recuperandi ?
1. In considering the first question it has been madeja doubt, whether so far as concerned the Antwerp cases, there *was a necessity for abandoning at all, because there having been no condemnation in a regular course of L law, there can be no appeal or redress in any mode of legal proceeding. This, in the opinion of some, is tantamount to a destruction of the property, and makes the claim of the plaintiffs against the French government so desperate, as to lie of no value in the eye of the law. It appears to me in a different light. The confiscation of the Antwerp cargoes was so flagrantly unjust, the claim of the parties insured is so strong against our own government, either to procure compensation from France, or to make it themselves, that I consider it as an interest, which ought to be abandoned before the plaintiffs are suffered to recover. In this point of view it appeared to the plaintiffs themselves, for they did abandon. But did they abandon in due time? They certainly did not abandon for a considerable time after they received notice of the first detention. Bo that if the defendants are right in their position, that in all cases of capture or detention, the insured must make an immediate election to abandon or not, on pain of forfeiting all remedy against the underwriters, the law is with them. It is a weighty question which has never before been fairly brought before the Court. For I do not consider the ease of Bell v. Beveridge, 4 Dall. 272, as bearing much upon the point. Chief Justice Shippeu in his charge to the jury submitted to them, whether the abandonment had been made within a reasonable time ; he told them, that what constituted a reasonable time, “ was a question of fact depending on the relative situation of the parties, the time and the place, after notice to the assured of the loss.” In that ease the French government took possession of the cargo for public use, promising to pay a liberal price for it, which promise however it did not keep. But there was no question how long under these circumstances the insured might wait before he abandoned. He rested his case on the situation of this country with respect to the yellow fever and other local causes, at the time he received notice, and the minds of the court and jury were drawn to these circumstances alone.
The law on the subject of the present inquiry, was certainly not settled in England before our revolution, even if it is now, which from any thing that I have seen, is far from being the case. As to the English decisions however, on the *418 ^'insurance, since the revolution, although we are glad to be informed of them, that we may profit by the sentiments of' men of learning and talents, yet as authority, they have no greater weight than the decisions of the French, or any other foreigners. I feel myself therefore unfettered by authority, and at liberty to decide this case upon what shall appear to me to be its true principles.
Judge Buller, in the case of Mitchell v. Edie, insinuated a doubt, whether it would not have been wiser for the courts to have decided many years ago, that the insured should not be allowed to abandon in those eases which are called technical total losses. If he had lived till this day, his doubts would probably have been increased. For the multiplicity of cases which have arisen in the course of a long and most extraordinary war, have produced difficulties which show the danger of leaving the path of truth in pursuit of fictions—of permitting a man to say that he has lost the whole of his property, when in truth he has lost but pari. The contract of insurance has been diverted from its true intent, the indemnification of the insured,—insomuch that in cases of valued policies, as the law is now held, it is very often the interest of the insured that a capture should take place, in order that be may seize the opportunity of throwing the property on the underwriters. On the other hand, the underwriter instead of inquiring into the actual loss, and indemnifying the insured accordingly, looks about for legal weapons to defend himself against the claim of his antagonist. I am not blaming either one or the other. Each in his turn may have been exposed to hardships from the established system, and each has a right to take advantage of the law when it makes in his favor. From late cases in England, I think I can perceive an inclination of the judges to retrace some of their footsteps in'thelawof abandonment. Inconveniences there certainly are as the law stands; but perhaps it is safest to leave it to the ingenuity of the merchants to remove them by new clauses introduced into the policy. This has been several times done by our merchants, and will no doubt be continued to be done.
In France and most other foreign countries, the time for abandonment seems to have been long fixed by positive law. In England where the maritime and commercial law was not reduced to a system so early as in France, there is no ^eS^atlve *provision on this subject. Nor do we find by adjudged cases, that they had thought much about it until the year 1787, when the case of Mitchell v. Edie was determined. As this is a leading case, and it appears to me *419 that the principle established by it,has been applied to cases not analogous, it is to be recollected that in that case there had been a capture, and the captors having stripped the vessel of her stores and part of her rigging, set her at liberty, and she came to the hands of the agent of the insured. The agent sold her and received the money, and it was not till three years, and after the agent had become insolvent, that the insured had recourse to the underwriter, offered to abandon, and claimed for a total loss. It was very clear, that this was a most unjust attempt; and the court decided accordingly. Ashurst Justice, in delivering his opinion said, that “ the insured are bound to decide and signify their election to the underwriters, whether they will abandon or not, the first opportunity.” Buffer J. was of the same opinion, and said, that “ unless the owners elected to abandon, it was only an average loss; they could not afterwards, be permitted to change the partial into a total loss.” The principle here laid down, applied to the subject matter, has. never been controverted. "When the insured heard of the Loss, he knew that it was partial; then was the time to determine-whether the voyage being lost, and part of the property saved, he would throw it on the underwriters, and have no more to do with it. No good reason can be assigned for permission to abandon in a later stage of the business, because although he was not allowed to abandon, he might recover to the amount of his damage, and that was all which in justice he could ask. The law was laid down in the same manner in Allwood v. Henckill by Lord Kenyon in the year 1795, Park 172, 4th ed. There was a capture and recapture. The ship was sold by order of the Court of Vice-Admiralty at Antigua, and one-eighth paid to the recaptors for-salvage. The insured did not offer to abandon, until four months after they heard of the loss. This was held to-be too late, but they recovered for a partial loss. Now it is attempted to apply this principle of being obliged to abandon in a short time after notice of the loss, to all cases of capture and detention, so as to ■ cut the insured off from all indemnification, when no part of the property is recovered, and the losses in fact total. The argument is this: You cannot recover without abandonment; but not having abandoned as soon as you heard of the loss, you shall not now be permitted to abandon ; therefore you cannot recover at all. There is something in this which I cannot digest. With what reason is the principle laid down in Mitchell v. Edie, which left the insured at liberty there to recover according *420 to his actual loss, applied to other cases, in such a manner as to cut him off from a recovery according to his actual loss? When two such different results are derived from the same principle, there must be something unsound in the application of it to one case or the other. Its application to the case in question, is endeavored to be supported by the inconvenience and injustice of permitting the insured to speculate on the prospect of future events, and the hardship of making the underwriter accountable, when the business is conducted by agents not under his control. If this argument is sufficient, it would follow, that the insured by not abandoning speedily, should be considered as taking the peril entirely upon himself, and discharging the underwriter from all responsibility for any damage flowing from that peril. Such a system, whatever might be thought of its justice, would at least have the merit of consistency. But is the law so held? By no means. On the contrary, it is confessed, that if it turns out a case of partial loss, there shall be a recovery accordingly. In Allwood v. Henckill mentioned before, the insured had a right to abandon on the capture, and claim for the total loss; but not having abandoned, and the case turning out by the recapture to be but a partial loss, he recovered the amount of the damage actually sustained, without a suggestion to the contrary. The result then of the law contended for by the underwriters is this,—that if the insured suffers a small damage he shall recover to the amount of it, but if he loses all he shall recover nothing. There is something so unreasonable in this, that my mind revolts at it: nothing less than peremptory authority could induce me to acquiesce in it. It was this consideration which pressed upon the Court, in the case of Watson and Paul v. The Insurance Company of North America, and drove them to the introduction of a principle of which I shall have occasion to speak hereafter. We have got into confusion by applying the same rule to cases essentially different. All losses in which the property was not entirely destroyed, have been called *technical, and put on the same footing. But there is a great difference between the case of a ship being stranded, where part of the goods come to the hands of the insured, and that of a seizure and confiscation where he gets nothing. The former is truly a technical total loss, the latter may more pi’operly be called an actual total loss; for where the property is entirely lost to the owners, it is the same to him as if burnt or sunk in the ocean.
*421 I am aware of the injustice of permitting the insured to speculate at the expense of the underwriters; and I grant that in case of capture, detention or arrest, where the loss being at first total, is liable to be rendered partial by subsequent events, unless the insured in a convenient and short time after notice of the capture signifies his election to abandon, it is reasonable, that he shall never after be permitted, if the loss proves partial, to convert it by abandonment into a total loss. lie shall go on to the end, and recover according to the truth of the case. If the property is restored, he shall recover the amount of the damage sustained; but if he loses all, he shall recover for a total loss. There is peculiar propriety in settling the law on this principle, in the actual situation of the United States. Being a neutral nation, the property of her citizens is not seized by the belligerents as prize, but in order to be carried into port, that an examination may be made, whether the laws of neutrality have been violated. The fact is, that it has been very often restored, and it would certainly be for the interest of the underwriters, that no abandonment should be made, till the cause has been decided. Of this they are very sensible, and have lately introduced a covenant into their policies, on the part of the assured, that there shall be no abandonment in the case of capture, until after sixty days’ detention, unless the property shall be condemned within the sixty days. One of the policies in question contains this covenant.
The counsel for the defendants cited the case of Calbraith v. Gracie, in the Circuit Court of the United States, where Judge Washington expressed his opinion, that unless the insured abandoned soon after notice of the capture, he could not recover against the underwriter in case of condemnation. The deliberate opinion of that learned judge has great weight with me, and it certainly is entitled to it. But having been of counsel for Oalbraith myself before his cause came to trial, I *know that he never made any abandonment; the time allowed for making an abandonment was not therefore directly before the court, and Lprfesume that Judge Washington in all probability did not give it a very particular consideration. But if his opinion was formed upon mature reflection, there stands opposed to it the opinions and settled practice of the courts of New York. As to the hardship of the underwriters being responsible when the business is not in the hands of their own agents, it is not greater in case of a total than of a partial loss. It is to be presumed that agents will act for the best, and it is to be always under *422 stood that for losses happening through the negligence or misconduct of their agents, the insured are responsible.
Let us now consider the circumstances of the cases before us, so far as is necessary to apply the law. The insured did not abandon until a very considerable time after they had received notice of the capture or detention of their property. The consequence is, that they must not have recourse to the underwriters until the event is known, and when known they are to recover according to the actual loss. In Bohlen’s case the property was condemned and has been totally lost; and he abandoned immediately on receiving notice of the condemnation. The Antwerp cases took a different turn. At first there was no apprehension of confiscation, or even sequestration. But unexpected difficulties soon disclosed themselves. The goods were sequestered, kept in the public stores for upwards of three years, and finally sold by order of the emperor, and the proceeds paid into his treasury. Montgomery and Newbold abandoned as soon as they heard of the sale, and Brown long before. I consider this as a total loss. It rests with the emperor whether he will ever make restitution. Perhaps he may ; but as the plaintiffs have no mode of compelling him, and no legal avenue is open to their claim, the property may be fairly said to be lost to them. Iiave the defendants any just cause of complaint against the plaintiffs or their agents, for their conduct in this unfortunate business ? I know of none. Bohlen’s agents appear to have taken all necessary measures to procure a decree of restitution, but in vain. The same may be said of the agents of Brown and Montgomery and Newbold. They took great pains, and Avent to considerable expense to remove the sequesNation. B ut it plainly ^appears that the emperor was governed by political motives. If the United States had gone to war with England, there is every probability, that the property would have been restored. On that event alone Avas the fate of the sequestered cargoes suspended. The emperor was not to be influenced by considerations of private justice. At length, tired of waiting, he ordered the goods to be sold. Theconduct of the parties was fair through-out. They gave an early intimation to the underwriters, that they should endeavor to procure restitution of their property, and should only look to them in case restitution could not be obtained. They did more ; they informed them from time to time of the steps they Avere taking, and requested their advice and directions as to any thing more which might be necessary to be done. But the underwriters declined any kind of interference or participation in the busi *423 ness. On the whole then, considering the circumstances of these cases, I am of opinion that the abandonments were made in due time.
2. My opinion on the first point renders it unnecessary to decide the second. I do not mean to decide it; yet as the case of Watson and Paul v. The Insurance Company of North America is directly on the point, I think it proper to say that I do not consider the law as settled by that decision. The court was not unanimous. It was not acquiesced in by the bar, and would have been carried to the Court of Errors and Appeals, had the nature of the case admitted it. But being a determination on a case stated, it was supposed that it could not be carried up by writ of error. There certainly are some weighty objections to the principle adopted by the court in that case. It takes away the necessity of abandonment in any case whatever, without affording sufficient protection to the rights of the underwriter; because instead of paying for the whole loss, and receiving an assignment of the whole chance of recovery, he is compelled to relinquish that chance, and may have to pay the whole loss, deducting a trifling sum for the value of the chance. Besides, there seems an impropriety in proving a total loss, and recovering for less than a total loss. There will be great difficulty too in reducing the rule to practice; for by what standard are the jury to estimate the hope of recovery ? It depends not on any known principles of law or justice, but frequently on the ^character, the temper, the caprice of the prince, or on secret political motives. The French courts obey the mandates of their government; and that the same is the case with the English Courts of Admiralty, has been long supposed and lately avowed. These are the thoughts which occur to me at present, but I request to be understood as not having formed a decided opinion.
Ye A tes J.
It would be an unnecessary waste of time to detail the grounds upon which I formed my opinion in Bohlen v. The Delaware Insurance Company. I there held, that as well on principles of commercial policy, as the true nature of maritime insurance considered as a contract of indemnity, the insured might abandon at any time, while the loss continued total, but that he would not be allowmd by a subsequent cession, to convert that which is at the time a partial into a total loss, merely because it had once technically existed. It rests in his election, whether he will relinquish his interest in the subject insured, upon hearing of the occurrence of any event guarded against by the policy ; but if he *424 declines so to do in a reasonable time, looking forward to the ultimate success of the voyage, he thereby subjects himself to the result of a total or partial loss according to subsequent events.
The cases differ in two particulars. In the present suit, there was no capture on the high seas, nor subsequent condemnation by a judicial tribunal; nor was there a clause in the policy, that the insured should not abandon in case of capture, until after sixty days’ detention unless previously condemned.
The ship Bordeaux Packet, wherein the teas insured were laden, sailed from this port before the Berlin decree was made known here, and arrived at Antwerp, her port of destination, on the 27th of February 1807. That decree was enacted on the 21st of November 1806, under the seventh and eighth articles whereof it was declared, “ that no vessel coming directly from England or her colonies, or having been there since the publication of this decree, shall be actmitted into any port of the French dominionsand “ that every vessel that by a false declaration contravenes the fore-^disposition, shall be seized, and the ship and cargo confiscated as English property.”
The custom house officers would not permit the ship’s cargo to be discharged, uutil permission for that purpose should be obtained from Paris. In the latter end of March 1807, the cargo was allowed to be discharged; but when landed, it was directed that it should be deposited in the stores of the custom house, there to await the pleasure of the emperor of France, whether it should be admitted to consumption or not. The minister was afraid to decide on this and other American cargoes, stored at Antwerp, but left the fate of the several cargoes to the emperor, whose whole attention was occupied by his military arrangements, and who seems to have had in view certain measures which might ultimately tend to hostilities between the United States and Great Britain, and carry through his continental system. The consignees however had no doubt but the result would be favorable, though the state of the market for tea was very unpromising. On the 24th of December 1806, the minister of the French marine and of the colonies, had written to General Armstrong the American envoy, that he considered the Berlin decree as not infringing the convention made between the United States and France on the 30th of September 1800. Repeated efforts were made to obtain a liberation of the cargo, but they all proved fruitless. Upon the 7th of •July 1807, General Armstrong wrote to Mr. Monroe, that the *425 Berlin decree had been so construed in France, that vessels leaving the ports of the United States before knowledge of the Arreté published there, were not deemed subject thereto. Upon the 6th of September 1807, Begnier, grand judge and minister of justice, in answer to certain questions proposed to him by our envoy, asserts that the emperor had not then decided, whether neutral vessels going to or from England without English goods on board, might be seized by armed French vessels.
The cargoes of the Bordeaux Packet, and of six other American vessels, remained in the stores of the custom house' at Antwerp, from April 1807, until the middle of May 1810, when the Emperor of France and the Empress arrived there. This being deemed one of the mottia témpora fandi, a respectful petition, but couched in strong terms, was presented *to him, praying a restoration of property, which had been locked up from the true owners. Instead of acceding thereto, the emperor ordered the several cargoes to be sold at public sale on the 15th of June following, and the moneys arising therefrom deposited in his caisse cVamortissement, until he should see proper to decide thereon. The sales took effect accordingly.
The ship on her passage to Antwerp, was captured and sent into Plymouth, where the captain made his protest on the 80th of January 1807. Shortly after the intelligence thereof had reached this port, the plaintiff asked the president of the Phcenix Insurance Company, “ whether he should then abandon, and what would be the proper steps he should take?” He received for answer, “you will soon hear of the ship’s release ; you had better wait for the next accounts.”
All the different letters received by the plaintiff from his correspondents at Antwerp, were duly communicated to the defendants, and upon the 13th of November 1807, a formal abandonment was executed to them. Upon this state of facts, the question arises, whether the plaintiff is to receive compensation for the loss he has sustained.
It is evident that the Bordeaux Packet was not subject to seizure by the law of nations, or by any ordinance of the French empire. . It is admitted, that both vessel and cargo were the exclusive property of American citizens. By the letter of the minister of the French marine, it appears that the Berlin decree was not opposed to the treaty made with the United States in 1800 ; and our own government have considered that decree as merely territorial. The practical construction given of it in France, publicly announced by our minister there, was, that ships sailing from the ports of *426 the United States, before it was known, were not obnoxious thereto.. It was not published here until the 10th of February 1807, above one month after the Bordeaux Packet sailed on her voyage. Mr. Ridgeway, commercial agent of the United States at Antwerp, who was one of the firm to whom the teas insured were consigned, had not the smallest doubt that the emperor’s decision would be favorable; although from his particular views and multiplied engagements, he thought it might be a considerable time before it came to hand. He went to Paris in May and September 1807, for *1^® exPress purpose of soliciting the liberation of the cargoes which had been stored ; and from his character as a public functionary, he must be supposed to be as well informed, as any agent of the defendants possibly could be, of the true object of the French government. It appears by the whole correspondence, that his attentions were unremitted ; and I cannot conceive that more could be done for the benefit of those concerned, than what he and his co-partners have attempted, although they failed in the execution.
Under these circumstances is it not naturally to be inferred, that if an abandonment had been proffered, during the period in which the most active measures were pursued to obtain possession of the cargo, the company would unhesitatingly have rejected it, and told the plaintiff, in the language of Mr. Lewis their president on a former occasion, “You will soon hear of the release of the cargo; you had better wait for the next accounts ”
It will not readily be believed, that Napoleon could easily be induced to relinquish a favorite scheme ; the features of his character, when in pursuit of a particular object, if we nmy trust to experience, are of the most inflexible cast.
The loss here has been incurred by one of the perils enumerated in the policy, “ the arrest, restraint and detainment of a sovereign power,” and time has evinced the fallaciousness of the flattering hopes first entertained respecting the cargo. When a period of seven months had elapsed, after the teas were landed, and placed in the custom house stores, without the emperor’s decision on their fate;—when his determination was procrastinated studiously until it could be ascertained what course of conduct the United States would pursue between the two belligerent nations, it was proper that the assured should have recourse to the assurers for indemnity. A loss technically total in the first instance, became absolutely so in the event, and all hopes of the liberation of the subject insured vanished. The observation of the *427 defendant’s counsel, that when the plaintiff made his abandonment, the emperor’s order to sell the property and place the proceeds in the caisse d’amortissement did not exist, only tends to show, that the cession might have been safely deferred until the goods were sold in 1810, and that it was made precipitately at too early and not at too late a day. But the *opinion I have adopted is, if the loss continued total, and was not varied by subsequent events, when the abandonment was made, that it might legally be made at any time. And upon the whole, I concur in opinion, that judgment he rendered for the plaintiff for a total loss (a).
*428 *JSbaokenb,idge J.
In the case of capture and condemnation, (final) can tliefe be said to be a hope of *429 recovery ? In the case of capture by one belligerent of the vessel of another, and condemnation, I do not see that there can ; for it is the fortune of war, and the individual must bear the loss. But *in the case of capture of a neutral vessel, it cannot but be presumed, that the nation to which the neutral belongs, will procure reparation, or make it to the individual. There is therefore a hope of recovery. Will not this hope be transferred by the payment of the loss? It will so. An equity will be raised by the law from the mere circumstance of payment. But an assignment or legal transfer is more convenient evidence, and there is the same reason why it should exist in this as in *other cases. The general rule therefore ought to be that of an abandonment in this as in other cases. But why such general rule or abandonment in any case ? Cannot what remains be deducted from the sum insured? But why deduct where the stipulation goes to an indemnity for the whole ? A hope of recovery, is the hope of the whole. The law must presume it to be the whole; for however the fact may be, yet in legal contemplation, it cannot be heard of in a court of justice, that the neutral nation, to which the *430 court belongs, is not both willing and competent to procure a reparation of injuries to her citizens, or make it herself. It is not so properly a hope, as an interest, that is to be abandoned in the case of a neutral capture; for the hope goes beyond the chance of recapture, which is but a hope. The chance of recapture is valued in the ease of ransom, but it is the party to the loss that values for himself. It is saying for how much he will give up the chance, in a case where no one else could say for how much he ought to give it up. A chance is not the subject of valuation, but in the mind of him who has the chance. I speak of mere abstract chance or possibility, where there are no given considerations, or certain grounds of calculation. But why introduce the difficulty, supposing it but a difficulty of calculation, unless an abandonment in this case is excluded? And if in this case, why not in all ? Or if not necessary in this case, why necessary in any? I hold therefore the expediency of an abandonment in all cases, where there is any thing remaining in substance or in hope to he abandoned. I say expediency, for what is expedient ought to be the rule. In the cases before us we have an abandonment, but it is alleged not to be in reasonable time; and an abandonment not in reasonable time, is said to be as no abandonment. ' This brings us to discuss the question of reasonable time, which .is by far the most difficult part of the rule, if there shall be any rule as to time.
Stipulations limiting time would found a presumption of convenience. Regulations limiting time would found a presumption of convenience. These are found in the marine ordinance, Napoleon code, &c. Limitation of time in all claims at common law, would found a presumption of convenience, and convenience is the mother of the rule as to time. It would seem therefore that an abandonment ought no^ *a^ an definite length of time. But what shall be the rule of time short of an indefinite period? Shall it be an abandonment instantly on the attachment or happening of the peril ? This rule is simple and has its advantages. It gives the chance of profits if any may accrue, to the insurer. It gives him the future agency if he chooses to take it; this, as soon as intelligence of the loss can be communicated, and an abandonment made.
But this rule has its disadvantages. It forces to an abandonment in the first instance, contrary to the wishes in most cases of the assured, and in most cases probably to the wishes of the insurer himself. Abandonment is to him in most cases an inconvenience. He would readily give up all *431 chance of profits to escape it. Were it left to himself, would he not submit to the agency of the insured for a time, to give him an opportunity of considering after the attachment of the peril, whether it would be for his interest to abandon ? In most cases the insurer might escape the having an abandonment thrown , upon him. As to profits, which an abandonment sometimes, contrary to the expectation of him abandoning, may afford, they are not likely to turn out contrary to the calculations of him, who has an immediate interest in calculating, and the greater means of reaching a probability of profits arising; and after being given up by him on bis calculation, it is not likely that such a result of profits will happen. To build a rule upon a possibility would not seem expedient. As to lying by to see whether the market will rise, so as to give profits w'hich may supersede the choice of an abandonment, is it not the interest of the insurer that he should do so, because in that case he the insurer will be relieved from an abandonment ? In a case of detention, is it not his interest to let the insured wait to see whether he cannot get off, and go on with his voyage ? In the case of a ship stranded, it is allowable. Where a ship is damaged, a reasonable time is given to see whether she cannot be repaired. In the case of a cargo damaged, .why not a reasonable time to see whether it cannot be disposed of so as to cover value and expenditures, and save an abandonment. But the agency quoad hoc and as to other matters, say the insurers, they ought to have themselves. They can best depend upon their own prudence as to the expediency of waiting, and as to the *care of the cargo, pending such a deliberation. But the place where must be very near, if it can be convenient or possible for them to take, or to exercise, such agency. The same may be said as to a certain extent, with regard to an agency in attending to the judicial proceedings in the case of capture and carrying in for adjudication. It would be an inconsistency that in a case of ransom.or compromise, the agency of the insured is allowed to bind the insurer, and yet exception taken to his agency in endeavoring to make the best of matters for a reasonable time after the peril has attached, and while he is making up his mind as to the hopelessness of profits from the adventure, and the expediency of an abandonment. On the ground of mutual interest to the parties, therefore it would seem that the reasons for and against the rule of an instant abandonment are at least in balance.
But will not the decision of the United States Courts, adopted here, bear upon this rule, so as to affect it to some
*432 extent ? I speak of the recent decision, that the state of the fact at the time of the abandonment shall govern. For in that ease an abandonment made on the receipt of intelligence, may be avoided by the state of the fact changed before the abandonment. Will not this effect a change in the rule as to the necessity of an instant abandonment? For if recapture after capture shall avoid an abandonment made, why not wait the chance of a recapture? If an acquittal after carrying in for adjudication, shall avoid an abandonment made, why not wait the chance of an acquittal ? If an acquittal in the last resort after condemnation in the first instance, shall avoid an abandonment made, why not wait the chance of such an acquittal? For though it is improbable that an acquittal on an appeal would have time to take place before intelligence of the capture would be communicated, and an abandonment made, yet it is possible; and on the state of the fact principle, this would avoid an abandonment.
If liberation after detention would avoid, why not wait for a liberation, as long as the insured should think advisable? The same of an embargo, which is a species of detention. The same of stranding, waiting the rise of a market, if waiting in these cases would avoid abandoning, re-abandoning, opening and shutting of the right to abandon, which is an inconvenience? Under every.system the alteration of one "^particular of a rule, must lead to an alteration of other particulars. The whole rule would seem to be affected by this alteration. I do not say that it is not for the best, but I make the quere, whether for the sake of uniformity and mutual convenience, the decision ought not to go further in terms as well as by consequence, and leave an abandonment to be made at any reasonable length of time?
Would not the Supreme Court of the United States seem actually to have carried out the consequence, and left the question of reasonable time to the circumstances of the case ? For if it is a question of fact to be left to a jury under the circumstances, it will follow that a jury may weigh according to circumstances. And that this is laid down to be law by the Supreme Court of the Union, I cite 6 Cranch 272. The law is settled, says the Chief Justice, that an abandonment to be effectual must be made in reasonable time; but what time is reasonable is a question, which has not yet been reduced to such certainty, as to enable the court to pronounce upon it without the aid of a jury. Certainly the delay may be so great as to enable every man to declare without hesitation, that it is unreasonable, or the abandonment may be so immediate, that all will admit it to have been made in rea *433 sonable time. But there may be such a medium between these extremes, as to render it doubtful,.whether the delay has been reasonable or otherwise. It must be found by a jury-
So far from considering it a question of law, as the English courts would seem to have done, in drawing the’analogy of notice to an endorser or drawer of a bill of exchange, that on the facts found in a special verdict, the Court of the United States refused to infer the fact of reasonable time, it being a question of fact and not of law, and this goes to prove that it is not a question compounded of fact and law, for otherwise the facts being found by the special verdict, the court could say what was the law arising. If a conclusion of reasonable time from the facts must be drawn by the jury in a special verdict, it is a conclusion of fact and not of law. But may not the Supreme Court of the United States therefore be considered, not only as changing the rule with regard to the state of the fact at the time of the abandonment entitling to abandon, but what may be considered as an incident of this or something to which it naturally leads, that there shall *be an enlargement of the rule as to reasonable time. The language of the court unquestionably would seem to give great latitude to the consideration of the jury, and it may be said, what have the court to do with it, if a question of fact solely. Have they not a right to assist the jury in weighing the evidence, and the power to set aside the verdict if against the weight of it? But this does not make it a question compounded of law and fact, if there can be such a compound. In speaking of the United States courts enlarging a rule or giving latitude of construction, I do not mean as to the law as it stood before our revolution. For it is contended that all this narrowness of construction, and application of the rule of reasonable time, has been since the declaration of our independence. And it would appear, that though in declarations at the earliest period on policies of insurance, we find an abandonment alleged,yet no plea, demurrer or. defence as to the time of making it. The rule would seem to have been of a recent date, in the case of Mitchell v. Edie in England since our independence, and adopted here probably from the mere habit of following English decisions, and sometimes without due examination of the reasons of them.
But what would seem to have been the rule before the case of Mitchell v. Edie? Pursuing the analogy of the law of indemnity in other cases, it would seem to be, that in all cases where anything remains in substance or in hope, the *434 insured shall abandon before suit brought; that he shall not be bound to abandon on the attachment of the peril, but that he shall have a reasonable time to wait events, and to .make up his mind as to the expediency of abandoning. All this is subject to the common law principle of what shall avoid the abandonment on the score of fraud or negligence, and this to the same extent with what shall defeat a recovery in the case of a demand for a partial loss.
This was in fact applying the rule of reasonable time to the special circumstances of the case. And I will acknowledge that I do not feel a repugnance to the revival of such a rule, when I consider the hardship of particular cases, which must come under a general rule of an abandonment on the attachment of the peril or not at all. The pressure of such a rule has led to softenings in the application, which are inconsistent with the'rule itself. Bell v. Beveridge may as an instance. But it was the pressure of this rule unquestionably which led to the decision of this Court in the case of Watson and Paul. In that case there was a struggle to evade the rule, from the hardship of the individual case. It was dispensed with by me, considering what had been done at an early period, viz., a demand of payment for a total loss, as amounting to an abandonment. The majority of the Court adopted the idea of deducting, which did not appear to me practicable, or to have been the law at any time; and looking since into the authorities cited by the judges in that case, I find them to go only to the recovery of a partial loss on a declaration for a total loss, and not to a recovery of a partial loss without an abandonment, when the loss was technically, but not physically total. This was the error. The idea of deducting in such a case the residuum saved and not abandoned, was novel, and not the worse for that, but it was impracticable. Estimating the value of a chance, can amount to nothing more than a guess or conjecture. In the case of Watson and. Paul it was suggested by me, as accounting for the abandonment not being expressly made, that the person had a ground to think there was'nothing to abandon. This was a dictum, and not the point upon which I put the case. But in this dictum I did not advert to the distinction of its being the capture of a neutral vessel, and not by one belligerent of the vessel of another. But I did not concur in the idea of deducting pro tanto the hope of recovery. The common law affords no analogy of the calculation of a chance by a jury, and deducting pro tanto according to that chance. In an action against a sheriff for an escape on mesne process, damages are not wholly *435 exemplary, I admit, but compensatory somewhat, because the custody of the person is in the mean time lost, which might be a means of compelling payment. But there is no deducting ; for the whole debt still remains recoverable against the debtor, who cannot give in diminution of it the damages against the sheriff. The same law in the case of negligence by an attorney. The jury will look at the insolvency of the debtor, reducing the damage as against the officer, but not as deducting from the creditor’s demand; and this is one of those cases where the damages are ad libitum of a jury, as much as the imposition of a fine by the court, who will also look at circumstances.
*1 do not consider myself bound by the case of "Watson and Paul; not merely on account of this impracticability, or my not acquiescing in it, but because it involved a consequence which the judges who decided it did not contemplate, the blowing up the whole doctrine of abandonment. It was in fact an oversight as I thought at the time, and error is not to be sanctioned because it has once got a footing. Even had I acquiesced in that decision, I would hold the right to reconsider. It can only be under the idea of originally weighing and subsequently reconsidering by the same or by other judges, that the common law came to be said to be the perfection of reason. But the law being considered as it was before the case of Watson and Paul, it involves the English rule of Mitchell v. Edie, of which rule I am not tenacious, not because it is an English rule, but because founded upon at least doubtful reason. English judges themselves are not so tenacious of their own rules, as not to change them, when experience has shown their inexpedienee, or when they are not found to bear the test of reason. They will depart occasionally with a manly freedom from the error of a former rule; for the stare decisis is a maxim which must have its limits. We are perhaps in these states in the habit of paying more deference to a decision of the English judges, than they are among themselves. The momentum of falling bodies is in proportion to the height from whence they fall. And we are in the habit of looking up even yet to the jurisprudence of that country, the canabula gentis, and birth place of our laws. The being before or since our independence does not weigh with me so much as the intrinsic reason of a determination. The idea was suggested in the argument, of getting over the rule of Mitchell v. Edie, by considering every new stage of the peril, or every new increased probability of final loss, as giving a new cause of abandonment. That would in fact be saying *436 that tbe right of abandonment shall continue with the decrease of the probability of a prosperous issue, which would be the same thing as setting aside the rule of the necessity of a prompt abandonment. But the several and progressive stages of an increased probability of loss finally, might serve as some rule or measure as to what was reasonable time within which to abandon.
*In the first case that was argued, Bohlen v. The Delaware Insurance Company, it has been contended, that tbe stipulation in the policy might serve to take the case out of the rule. The stipulation was not to abandon within sixty days unless sooner condemned. Under this stipulation it is obvious that the insurer had in view the chance of a recapture or of an acquittal within sixty days, which would relieve him from having the abandonment thrown upon him. It is evident that he waives the advantage of bis own agency, if there is any advantage in his own agency, in and about the adjudications ; and this in order to increase the chance which he thereby has of escaping the abandonment. So far as this goes, it is evidence that the insurer has an interest in submitting to the agency of the insured, where there is a chance that by so doing he may escape an abandonment. And it cannot but be inferred, that the insurer would have consented to the stipulation readily, that the insured might have his option not to abandon until a final condemnation; for the stipulation is in restraint of the insurer’s privilege as to time. But though I can have no doubt that the insurer would have consented to such a stipulation readily, yet he has not consented to it, for it is not made. The insured was not bound to wait the final condemnation ; and the insurer would not in that case be bound to waive the advantage of avoiding an abandonment not instantly made, which is his part of the rule. It is only so far as both are bound by a stipulation, that it can be said to be mutual and in the understanding of the parties. I cannot consider the terms of this stipulation as taking the case out of the rule.
In what are called the Antwerp cases, it has been said or may be said, that on the seizure at Eort Lillo, it was difficult to say, whether it was not in the nature of a port regulation; difficult to know what name to give the storing of the cargo, .and not permitting a sale until the will of the emperor was known. It was a detention sub m’odo, and out of the usual way. Antwerp was the port of discharge; here the vessels had arrived, and the question was with respect to the right of entry. No tribunal at the place, or authority to decide what was to be done. . The insured it may be said could not *437 well give a name to the thing, and say what was done. The detention was by the functionaries at the place; but in that *unsettled state of affairs, it might seem difficult to say with certainty, whether it was the act of the government. That the final appropriation was the first and the last act of a nature unequivocal, that came to bear upon the property. That every thing in the mean time was done that could be done, to obtain a decision of the government; that Communications were constantly made to the insurers of what was done and doing as to the property detained, with a view to have advice; and though an offer to abandon was not expressly made, yet we cannot but infer a willingness to make it, if the least desire had been expressed to receive it. That as to the having made a conditional sale in the mean time, there is nothing in that which can affect the case, and with that I agree. It was not with a view to a speculation of profits, that the abandonment was not instantly made; but to the profits justly iu expectancy from the nature of the adventure. Had not the insured reasonable ground to think, that the right of abandonment, until the act of appropriation, might be questioned, and to avoid controversy might he not have thought it advisable to wait a more advanced stage of the detention? And if justifiable in delaying an hour, when did the obligation to abandon absolutely attach ? These things have been urged, and may be weighed as constituting an exception to the rule. All I can say is, that it would amount to a hard case, and brings in question the policy of a rule which would embrace such a case. But I find myself more inclined to set aside the rule, than to sustain the exception. We shall be perpetually driven, perhaps in our neutral more than in a belligerent situation, to relieve from the pressure of an inconvenient rule by sustaining exceptions. That rule must be too rigorous which leads to struggle for the justice of particular cases, by the multiplication of exceptions. I cannot think the rule in this case as to an immediate abandonment, is founded in the mutual interest and convenience of the parties; and this is the test of every rule that is arbitrary in its nature, and which may be one way or the other. Utilüas justi prope mater et cequi. It is of great weight that this rule would seem to have been known to the common law of Europe on the subject of insurance. Nor can I find that it was known to the common law of England. It is of post revolutionary origin in England, and post revolutionary introduction here.
*1 am therefore prepared to enlarge the rule, in which case the abandonment in the instance before *438 us will be good ; there being exceptions, but on the score of not having made the abandonment immediately, or as soon as intelligence could be communicated. So that on the ground of enlarging the rule of reasonable time, not upon exceptions out of the rule as it at present stands, my judgment is for the assured.
Judgment for plaintiffs.
[Cited, in 9 Barr, 399 ; 9 H. 522.]

 His Honor’s opinion in the case of Montgomery v. The United States Insurance Company was as follows :
Yeates J. The observations which I have made in Brown v. The Phœnix Insurance Company, are equally applicable to the present case. Both policies were underwritten on goods laden on board the Bordeaux Packet, on a voyage at and from Philadelphia to Antwerp, and until the same should be safely landed at Antwerp. A more voluminous correspondence was given in evidence during the trial of this suit; but the great features of both eases are the same, with this single difference, that the abandonment in Brown’s action was made on the 13th of November 1807, but in the present instance, it was not formally executed until the 4th of October 1810.
It was correctly remarked by the plaintiff’s counsel, during the argument, that the letters which had passed between the parties, afforded a strong practical answer to the objections made on the part of the defendants on the score of agency. The material information disclosed in the letters of the consignees to the plaintiffs was duly communicated to the defendants, and no less than fourteen letters on the subject of the detention were written by the plaintiffs to them. The first letter under the date of 5th November
1807, gave notice to the company that they would be looked to for the loss arising from the detention of the Bordeaux Packet, and several of the subsequent letters expressed the difficulties that they labored under, their ignorance of the most eligible steps to be taken, and earnestly solicit the advice, co-operation and aid of the underwriters in their embarrassments, promising to govern their measures by the advice they should receive. The first answer given was on the 16th of June 1808, wherein the company seem to suppose, that the warranty on the part of the insured had not been complied with, and peremptorily declare themselves not liable in case of a final condemnation, but neither in this nor in their other answers of 8th September
1808, or 21st October 1810, do they offer any advice or interference, or suggest the slightest idea of an agency. An offer to abandon should be promptly met by a correspondent offer to pay the loss. The acts should be simultaneous, and until indemnity be given for the loss, the assurers are not entitled to demand a cession. Indeed if the assurer has paid the loss, he then becomes a purchaser of the subject insured; and if it be afterwards recovered, it will belong to him. Gracie v. New York Insurance Company, 8 Johns. 245 ; Da Costa v. Firth, 4 Burr. 1966 ; 2 Emerig. 175.
Another fact clearly appears from the correspondence between the plaintiffs and their consignees. The former did not speculate on the fall or rise of the foreign markets: they made their cession when coffee and indigo bore good prices at Antwerp; and in their letter of 7th May 1808 to Ridgway, Mertens & Co. they say 1 ‘ when our goods were first detained their prices *428 were low, and it was our interest to abandon; but we never made shipments with that view, and had not a doubt but our goods would be released.”
The objection against the plaintiffs’ recovery relied on by the defendants, is, that there was no abandonment within a reasonable time by the plaintiffs, after notice was received by them of the detention of the coffee and indigo insured, and without an early abandonment there can be no recovery for any sum however small, whore the whole or any part of the property physically exists. This position is certainly too broadly taken, because where the sentence of condemnation of the subject insured has been affirmed in the dernier ressort, it is settled that there can be no spes recuperandi; 8 Johns. 237 ; and we may safely ask in the language of Sir William Scott, “what ground of alleviation or comfort is it to the neutral merchant, whether his property is condemned to the captor or to the state?” Case of the Sansom, 6 Rob. 418.
It has been said that the case of Watson and Paul v. Insurance Company of North America, 1 Binn. 47, merits reconsideration. I see no reason for retracting the opinion which I formed in that suit. All the books agree, that the assured is never obliged to abandon, and if he does not, he is always entitled to recover to the extent of his loss. The object of abandonment is to turn that into a total loss which otherwise would not be so. 8 Johns. 244. A technical total loss originates in the danger of a real total loss. 4 Cra. 205. I never can reconcile it to my ideas of right and wrong, that the assured upon a partial loss, when he has nominated his own agents, shall recover to the utmost extent of the injury he has sustained, even to 99 per cent., and yet where the real loss as to the assured goes to the whole of the subject insured, that he shall not have the slightest claim to remuneration, merely because he has not gone through the formality of an early abandonment, when the whole or part of the property still exists in fact. This doctrine appears to me to sacrifice substantial justice and commercial equity to idle form, and is too rank for my digestion. I admit there is no known settled standard whereby human hopes or fears may be graduated. They vary according to the structure of our minds ; and often of our bodies. Chances cannot be calculated with absolute precision, nor are they susceptible of mathematical demonstration, as propositions in geometry. But it consists with every day’s experience, that they are bought and sold in the market; and it is not difficult to conceive that in mercantile life, purchasers may be found in a coffeehouse, who will willingly enter into a contract for what they deem a good bargain, though it may be greatly influenced by the chapter of accidents. I do not however take this to bo a case wherein the spes recuperandi can enter into our consideration.
Napoleon did not commence his favorite continental system by an open hostile act against the United States, nor was the Berlin decree of that character. It professed to be a mere municipal regulation, affecting vessels which had been in England, and denying them entry into French ports. But in its execution it terminated in the violation of the rights of neutral nations, in order to gratify the hostile spirit entertained against Great Britain. For a long time strong hopes were indulged at Antwerp, that the restraint of the vessels and cargoes was merely temporary, and that the obstacles would at length be removed. In the letter of Mertens the consignee to the plaintiffs, dated 24th November 1809, he says, “that a new application has been made to the emperor, who has returned to Paris: it was difficult to pronounce how he would decide, but the writer hoped favorably.” In the previous letters of the consignees, the character of the emperor is strongly, *429 but faithfully delineated. In their letter of the 4th May 1808, they make these observations: “We notice what you say, that it is in contemplation to present a petition to the emperor:—he does not mind these things.” And again in their letter dated 23d April following:—“ No decision has yet been given by the emperor, nor will there be one, until your government takes a decided part—no representation from merchants are attended to—all depends on the good or ill humor of one man.”
The studied delays of Napoleon damped their expectations; and when he finally decided in March 1810, that the cargoes should be sold and the money placed in his own coffers, all hopes of recovery vanished, and no appeal was left to individuals. They could not prosecute their claims, and had no legal mode of redress. No spes recuperandi in a legal sense therefore existed, or none which could be the subject of liquidation. Any chance of reimbursement would be the result of future negotiation between the two governments, which was a subject totally unfit for the investigation of a jury. No court was competent to act on siich speculations. 8 Johns. .245.
At no time after the arrival of the ship at Antwerp, and the attempt of the captain to enter at the custom house, were the coffee and indigo insured under the control of the consignees. The actual sale of the goods by the emperor’s orders on the 15th June 1810, fully disclosed his views, that the restoration of the property should depend on political events, and not on the justice of the case. The subjects insured as to the plaintiffs were as irretrievably lost, when the articles were converted into cash, and deposited in the caisse d’ amortissement, as if they had been sunk in the ocean. The sale furnished a complete, distinct, independent ground of abandonment; and thinking as I do, that the cession was legal, if the loss was really total when it was made, and so continued until the time of bringing the suit, I am of opinion, that judgment be entered for the plaintiffs for the 12,749 dolls. 30 cents, found by the jury for a total loss.