ELISHA C. LEONARD, assignee, *vs.* WILLIAM F. NYE.

Bristol.    Oct. 25, 1877. — Oct. 21, 1878.    LORD & SOULE, JJ., absent.

Money paid by the United States, according to a decision of the Court of Commissioners of Alabama Claims, under the U. S. St. of June 23, 1874, to the owner of a cargo destroyed by one of the insurgent cruisers, with respect to which it was determined by the Tribunal of Arbitration at Geneva, constituted by virtue of the Treaty of Washington of 1871, that Great Britain had failed to fulfil her duties as a neutral government, belongs to an assignee of such owner, appointed under the bankrupt act of 1867, after the destruction of the property and before the making of the treaty; and may be recovered from the owner by the assignee in an action for money had and received.

The U. S. St. of February 26, 1853, requiring assignments of any claim upon the United States to be executed in the presence of two witnesses, and after the allowance of the claim, the ascertainment of the amount due, and the issue of a warrant for its payment, applies only to voluntary assignments *in pais,* and not to assignments by operation of law in bankruptcy proceedings.

A sale by an assignee in bankruptcy, under order of the court, of "certain choses in action, consisting of certain bills, notes and accounts, nominally of the value of about $1000, but in reality nearly worthless," does not include the right of the assignee in money afterwards awarded to the bankrupt by the Court of Commissioners of Alabama Claims for the previous destruction of his property by an insurgent cruiser.

CONTRACT for money had and received.    At the trial in the Superior Court, before *Aldrich,* J., without a jury, the following facts appeared :

On February 19, 1868, the defendant was duly adjudged a bankrupt under the laws of the United States by the District Court of the United States for the District of Massachusetts, and on March 13, 1868, the plaintiff was duly chosen assignee of the defendant's estate, and a legal assignment thereof was made to him by that court.

On October 6, 1868, the plaintiff presented a petition to the District Court, representing that, " in order to settle his accounts with said estate, it is necessary to dispose of certain choses in action, consisting of certain bills, notes and accounts, nominally of the value of about one thousand dollars, but in reality nearly worthless," and therefore asking leave to sell the same at private sale, with or without public notice, as he might judge expedient. Upon the recommendation of a register in bankruptcy, the District Court passed an order granting this petition.    And the plaintiff sold those assets as above described.

On January 14, 1875, the defendant presented to the Court of Commissioners of Alabama Claims a petition for damages sustained by the destruction of merchandise belonging to him on board the whaling barque Abigail, destroyed with her cargo on May 27, 1865, by the insurgent cruiser Shenandoah, after her departure from Melbourne, Australia. Upon that petition, that court, on April 5, 1876, awarded to the defendant the sum of $1088.35 and interest, amounting in all to $1507.61, which, less $188.45, the expense of recovering the same, was paid to the defendant on September 15, 1876. The plaintiff filed no petition in that court; and this claim was not disclosed by the defendant in his schedule in bankruptcy, and was not known to the plaintiff until after the award, and he then demanded the sum of the defendant.

The plaintiff put in evidence the Treaty of Washington between the United States and Great Britain, promulgated July 4, 1871; the award of the Tribunal of Arbitration at Geneva, made September 18, 1872; and the act of Congress of June 23, 1874, creating the Court of Commissioners of Alabama Claims. The defendant cited the Treaty of Washington; the several acts of Congress relating to the Court of Commissioners and to the payment of its awards; the act of Congress of February 26, 1853, concerning the transfer of claims against the United States; the publications of the Department of State of the United States relating to the Geneva Arbitration, and the debates in Congress regarding the Geneva Award; and it was agreed that they might be referred to at the argument.

Upon this evidence, the defendant asked the court to rule that the plaintiff could not recover; that the claim described in the defendant's petition to the Court of Commissioners of Alabama Claims did not pass by the assignment and proceedings in bankruptcy; and that, if it did so pass, the plaintiff had sold and assigned the same. But the judge declined so to rule; and ruled. that that claim did pass by the assignment in bankruptcy, and the plaintiff could recover; and found, and ordered judgment, for the plaintiff in the sum of $1386.88. The defendant alleged exceptions.

*C. W. Clifford*, for the defendant.
*E. L. Barney*, for the plaintiff.

Gray, C. J.   This case presents the question, whether money paid by the United States according to a decision of the Court of Commissioners of Alabama Claims, under the act of Congress of June 23, 1874, to the owner of a cargo destroyed in 1865 by one of the insurgent cruisers, with respect to which it was determined by the award made at Geneva by the Tribunal of Arbitration, constituted by virtue of the Treaty of Washington of 1871, that Great Britain had failed to fulfil her duties as a neutral government, belongs to an assignee of such owner, appointed under the bankrupt act of 1867, after the destruction of the property, and before the making of the treaty.

The leading American authority upon this subject is *Comegys* v. *Vasse*, 1 Pet. 193.   In 1802, Vasse, who had previously been an underwriter on ships and cargoes, the property of citizens of the United States, captured and carried into the ports of Spain and her dependencies, and who had received abandonments from the owners and had paid them the losses caused by such captures, was proceeded against as a bankrupt under the act of Congress of April 4, 1800, and an assignment of his property was made to Comegys and others as his assignees in bankruptcy.   By the treaty with Spain of 1819, by which Florida was ceded to the United States, the United States renounced all claims of their citizens upon the government of Spain for such captures, and undertook to make satisfaction, to an amount not exceeding five millions of dollars, for the same as ascertained by commissioners appointed by the President to receive, examine and decide upon the amount and validity of all such claims.   8 U. S. Sts. at Large, 258, 260.   In 1821, Congress authorized such commissioners to be appointed, conformably to the stipulations of the treaty.   3 U. S. Sts. at Large, 639.   In 1824, the assignees in bankruptcy of Vasse received from the treasury of the United States about nine thousand dollars, being the sum awarded by the commissioners on account of the captures and losses of the vessels and cargoes insured by Vasse ; and Vasse afterwards brought an action of assumpsit against his assignees to recover this sum.

The Supreme Court of the United States, in an opinion delivered by Mr. Justice Story, unanimously held, 1st. That the decision of the commissioners was not conclusive of the right of

the assignees to hold against the bankrupt the money awarded
to them ; 2d. That the abandonment by the owners of the ships
and cargoes to Vasse, the underwriter thereon, assigned not only
the property itself, or its proceeds if restored after an unjust
capture, but also any compensation awarded by way of indem-
nity therefor, and, consequently, that the sum awarded by the
commissioners belonged to Vasse, if it had not passed by assign-
ment from him ; and also by a majority of the court (overruling
the decision of Mr. Justice Washington on the circuit, reported
4 Wash. C. C. 570,) decided that this right of Vasse had passed
by the assignment in bankruptcy to his assignees, and therefore
he could not maintain the action against them.

The grounds of the decision upon the first point may be
summed up thus : The authority of the commissioners and the
effect of their award were limited to ascertaining and deter-
mining the validity and amount of the original claims for dam-
ages and injuries against Spain. The determination of that
question did not require the commissioners, and the powers con-
ferred upon them did not permit the summoning in of the neces-
sary parties and witnesses to enable them, to adjust the conflict-
ing rights of different citizens in the fund awarded, or to decide
who was the original legal, as contradistinguished from the equi-
table, owner, or whether the present ownership was in assignees,
personal representatives, or *bonâ fide* purchasers. But the rights
of any claimant, as well as of all other persons, in the sum
awarded to him by the commissioners, were left to the ordinary
course of judicial proceedings in the established courts, where
redress could be administered according to the nature and extent
of the rights or equities of all the parties. 1 Pet. 212, 213.   A
similar decision was afterwards made by the same court as to an
award of the commissioners under the treaty with France of
1831, and the act of Congress of 1832 to carry that treaty into
effect.   8 U. S. Sts. at Large, 430.   4 U. S. Sts. at Large, 574.
*Frevall* v. *Bache*, 14 Pet. 95.

The reasons assigned in *Comegys* v. *Vasse* for the decision
upon the second point bear so strongly upon the case before us,
as to make it proper to state them more fully, which cannot be
better done than by quoting some passages from the opinion.

" In general, it may be affirmed, that mere personal torts, which die with the party, and do not survive to his personal representative, are not capable of passing by assignment; and that vested rights *ad rem* and *in re*, possibilities coupled with an interest, and claims growing out of, and adhering to property, may pass by assignment." " The law gives to the act of abandonment, when accepted, all the effects, which the most accurately drawn assignment would accomplish." " Whatever may be afterwards recovered or received, whether in the course of judicial proceedings or otherwise, as a compensation for the loss, belongs to the underwriters." Both upon authority and upon principle, " the right to the compensation in this case was in its nature assignable, and passed by abandonment to Vasse." " The right to indemnity for an unjust capture, whether against the captors or the sovereign, whether remediable in his own courts, or by his own extraordinary interposition and grants upon private petition, or upon public negotiation, is a right attached to the ownership of the property itself, and passes by cession to the use of the ultimate sufferer. If so assignable to Vasse, it was equally, in its own nature, capable of assignment to others; and the only remaining inquiry would be, whether it had so passed by assignment from him."

" It is not universally, though it may ordinarily be one test of right, that it may be enforced in a court of justice. Claims and debts due from a sovereign are not ordinarily capable of being so enforced. Neither the King of Great Britain, nor the government of the United States, is suable in the ordinary courts of justice, for debts due by either. Yet who will doubt that such debts are rights? It does not follow, because an unjust sentence is irreversible, that the party has lost all right to justice, or all claim, upon principles of public law, to remuneration. With reference to mere municipal law, he may be without remedy; but with reference to principles of international law, he has a right, both to the justice of his own and the foreign sovereign. The theory, too, that an indemnification for unjust captures is to be deemed, if not a mere donation, as in the nature of a donation, as contrasted with right, is not admissible." " The very ground of the treaty is, that the municipal remedy is inadequate; and that the party has a right to compensation for illegal

captures, by an appeal to the justice of the government. It was never understood, that the case was one to which the doctrine of donation applied. The right to compensation, in the eye of the treaty, was just as perfect, though the remedy was merely by petition, as the right to compensation for an illegal conversion of property, in a municipal court of justice." "It recognized an existing right to compensation, in the aggrieved parties, and did not, in the most remote degree, turn upon the notion of a donation or gratuity. It was demanded by our government as matter of right, and as such it was granted by Spain." 1 Pet. 213–217.

The court pointedly condemned, as unsatisfactory, the reasoning of Sir Thomas Plumer, M. R., in *Campbell* v. *Mullett*, 2 Swanst. 551, so far as it tended to support a different view; and cited, as authorities establishing its own conclusion, the decision of Lord Chancellor Hardwicke in *Randal* v. *Cockran*, 1 Ves. Sen. 98, and those of Chief Justice Kent and his associates in the Supreme Court of New York, in *Gracie* v. *New York Ins. Co.* 8 Johns. 237, and of the Supreme Court of Pennsylvania in *Watson* v. *Ins. Co. of North America*, 1 Binn. 47.

Mr. Vesey's brief but explicit report of *Randal* v. *Cockran*, which was decided in 1748, is as follows: "The King having granted general letters of reprisal on the Spaniards for the benefit of his subjects, in consideration of the losses they sustained by unjust captures; the commissioners would not suffer the insurers to make claim to part of the prizes, but the owners only, although they were already satisfied for their loss by the insurers; who thereupon brought the present bill.

"Lord Chancellor was of opinion, that the plaintiffs had the plainest equity that could be. The person originally sustaining the loss was the owner; but after satisfaction made to him, the insurer. No doubt but from that time, as to the goods themselves, if restored *in specie*, or compensation made for them, the assured stands as a trustee for the insurer, in proportion for what he paid; although the commissioners did right in avoiding being entangled in accounts, and in adjusting the proportion between them. Their commission was limited in time; they see who was owner; nor was it material to them to whom he assigned his interest, as it was in effect after satisfaction made." 1 Ves. 98.

As observed by Mr. Justice Story, " This case reflects no inconsiderable light upon the point already discussed, as to the conclusiveness of the award of the commissioners. But it is decisive, that the assignment by abandonment is competent not only to pass the property itself, or its proceeds, if restored, after an unjust capture, but also any compensation awarded by way of indemnity therefor. The case before Lord Hardwicke was the stronger, because the indemnity was awarded to the party by his own sovereign, and not by the sovereign of the captors." 1 Pet. 215. And again : " The case of *Randal* v. *Cockran* stands upon the true ground. It considers the right of indemnity as travelling with the right of property. In that case it might have been said, in answer to the claims of the underwriters, that they had no title, because it was a case of donation by the Crown, out of funds provided by reprisals. So, perhaps, the commissioners thought; but Lord Hardwicke decided otherwise." 1 Pet. 217.

The very point, which Mr. Justice Story here suggests might have been taken in *Randal* v. *Cockran*, was in fact urged in the precisely similar case of *Blaauwpot* v. *Da Costa*, 1 Eden, 130, decided ten years later by Lord Keeper Henley, (afterwards Lord Chancellor Northington,) but the report of which, not having been published in England until shortly before the decision in *Comegys* v. *Vasse*, does not appear to have been known to the Supreme Court at the time of that decision. In *Blaauwpot* v. *Da Costa*, underwriters in Amsterdam, in 1729, issued a policy of insurance to De Paz on a ship, which was soon after seized by the Spaniards, before the declaration of war between Great Britain and Spain, and carried into Havana and condemned, and the underwriters, in 1730, paid the amount of the policy to the assured. In 1741, the King of Great Britain, by proclamation, ordered a distribution of all prizes, taken before the declaration of war, in equal moieties between the sufferers and the captors ; and in 1746, under a commission for the distribution of such prizes, a sum greater than the amount of the policy was paid to the executors of De Paz as a compensation for the loss of the ship. The underwriters brought a bill in equity against such executors, to recover the amount of the policy. Mr. Eden's report, which is from the manuscripts of Sir Thomas Sewell, (afterwards Master of the Rolls,) who was one of the counsel for

the executors, shows that they argued, " If this is in the nature of salvage, the underwriters must undoubtedly have the benefit of it. But it is not so ; it is a grant of the King; a royal bounty to British sufferers, and not an act of justice. The commissioners for the distribution were only allowed to pay the difference to the sufferers. The plaintiffs as foreigners could not have claimed under the commission." But the Lord Keeper granted the relief prayed for, saying, " I am of opinion that upon the policy, and the peril happening, and the payment of the money by the underwriters, the whole rights of the assured vested in them. The assured had this right of restitution vested in them against the Spanish captors, which was afterwards prosecuted by the Crown by reprisals. Satisfaction having been made in consequence of that capture, I think the plaintiffs are entitled to that benefit; and that it was received by the executors of Elias De Paz in trust for them. The defence of the plaintiffs being foreigners, and as such not entitled to any benefit, is a fallacy; they stand in the place of British subjects, and have therefore in this court the same rights as British subjects. The capture is the origin of that right, which belongs to the plaintiffs by relation, as claiming under one of the sufferers. As to the nature of the salvage, it was so much saved out of the hands of the Spaniards by means of the interposition of the Crown ; it was so understood by the Crown. It was to be considered as a retribution to the underwriters as lessening the loss incurred by the capture." 1 Eden, 131, 132.

The case at bar does not present for adjudication any question of the rights of insurers, and the quotations from the opinions of Lord Hardwicke and Lord Northington and of the Supreme Court of the United States have not been made with a view to such a question, but because they state, more clearly and forcibly than any other authorities with which we are acquainted, the nature of the right of the owner of property destroyed by the act of a foreign government, in a sum afterwards awarded to him by his own government by way of compensation for such loss, either out of reprisals made by the latter upon the former, or out of a fund set apart by the latter for the purpose, in accordance with a treaty by which it has renounced all claims of its citizens upon the former ; and because they fully establish the position that

the right in a sum so awarded is an interest legally capable of being assigned by the owner of the property, even before his own government has taken any steps toward securing to him an indemnity for his loss. See also *Dickenson* v. *Jardine*, L. R. 3 C. P, 639, 643; *Sheppard* v. *Taylor*, 5 Pet. 675; *Milnor* v. *Metz*, 16 Pet. 221, 227; *Rogers* v. *Hosack*, 18 Wend. 319, 332; *Clark* v. *Wilson*, 103 Mass. 219, 222; *Williamson* v. *Colcord*, 13 Bankr. Reg. 319.

By the Treaty of Washington of 1871, the British government expressed its regret "for the escape, under whatever circumstances, of the Alabama and other vessels from British ports, and for the depredations committed by those vessels;" and it was agreed that all claims "growing out of acts committed by the aforesaid vessels, and generically known as the 'Alabama Claims,'" should be referred to a Tribunal of Arbitration; that the tribunal should first determine, as to each vessel separately, whether Great Britain had, by act or omission, failed to fulfil any of the duties set forth in the rules prescribed in the treaty itself or recognized by the principles of international law, and should certify such fact as to each of the vessels; that the tribunal, in case of finding any such failure of duty, might, if it should think proper, "proceed to award a sum in gross to be paid by Great Britain to the United States for all the claims referred to it;" and, in case of the tribunal's finding such failure of duty and not awarding a sum in gross, it was agreed that a board of assessors should be appointed, "to ascertain and determine what claims are valid, and what amount or amounts shall be paid by Great Britain to the United States on account of the liability arising from such failure, as to each vessel, according to the extent of such liability as decided by the arbitrators;" and the two nations engaged to consider the result of the findings of the Tribunal of Arbitration, and of the board of assessors, should such board be appointed, "as a full, perfect and final settlement of all the claims hereinbefore referred to," and that every such claim, whether presented to the tribunal or the board, or not, should be afterwards considered and treated as finally settled and barred.

The Tribunal of Arbitration determined that Great Britain had failed to fulfil her duties as a neutral government, with re-

spect to the Alabama and the Florida and their tenders, and to the Shenandoah after her departure from Melbourne on February 18, 1865; and therefore awarded a sum in gross of fifteen and a half millions of dollars, as the indemnity to be paid by Great Britain to the United States for the satisfaction of all claims referred to the consideration of the tribunal.

By the act of Congress of March 3, 1873, it was enacted that this sum, when paid by Great Britain, should be paid into the treasury, and used to redeem, so far as it might, the public debt of the United States, and that an amount equal to the debt so reduced should be invested in bonds of the United States to be held subject to the further disposition of Congress. That act did but provide for an investment of the fund until Congress could direct how it should be disposed of. The United States have doubtless the sovereign power of determining what application shall be made of money received under a treaty for injuries caused to the property of their citizens by the wrongful or negligent acts of another nation, and are not liable to suit in any court or tribunal, except as they have consented to be so sued. *Comegys* v. *Vasse*, 1 Pet. 216. *United States* v. *Clarke*, 8 Pet. 436, 444. *Rustomjee* v. *The Queen*, 1 Q. B. D. 487. The amount was afterwards received from Great Britain, and paid into the treasury of the United States, and invested according to the directions of that act.

By the act of Congress of June 23, 1874, a court, entitled the Court of Commissioners of Alabama Claims, was created for the adjudication and disposition of the money so received into the treasury. This act provided that in all claims presented before the court the person prosecuting the claim should be deemed the complainant and the United States the respondent; and that the court should consider the evidence offered by the respective claimants and in opposition thereto. §§ 3, 7.

By § 11, it was made the duty of the court "to receive and examine all claims, admissible under this act, that may be presented to it, directly resulting from damage caused by the so-called insurgent cruisers Alabama, Florida, and their tenders, and also all claims, admissible under this act, directly resulting from damage caused by the so-called insurgent cruiser Shenandoah after her departure from Melbourne on the eighteenth day

of February, eighteen hundred and sixty-five; and to decide upon the amount and validity of such claims, in conformity with the provisions hereinafter contained, and according to the principles of law and the merits of the several cases ; " and all claims were required to be verified by the oath of the claimant, and to be filed within a certain time, or else to be deemed to be finally and conclusively waived and barred.

By § 12, the court was to allow claims for such loss or damage only as the party injured, his assignees or legal representatives, should not have received compensation or indemnity for, from any insurer or otherwise ; and was to allow no claim for or in behalf of any insurer, either in his own right, or as assignee or otherwise, in the right of the party insured, except for the excess of such claimant's losses, during the late rebellion, in respect to war risks, over the sum of his premiums upon such risks ; and no claim in favor of any insurance company not existing at the time of the loss under the laws of some state of the United States, or in favor of any person not entitled, at the time of his loss, to the protection of the United States, or who did not, at all times during the rebellion, bear true allegiance to the United States.

By §§ 14, 15, the Secretary of the Treasury was directed to pay the judgments of that court, or, if they should exceed the amount of money received from Great Britain, then to distribute that amount, in ratable proportion, among the parties in whose favor such judgments should be rendered, or their legal representatives, in full satisfaction and discharge of such claims and judgments ; such payments to be made out of any unappropriated money in the treasury, and, as made from time to time, the bonds issued by the United States, under the act of 1873, to be cancelled and extinguished to an equal amount.

The claims for the destruction of property of citizens of the United States by the Alabama and the Florida, and by the Shenandoah after her departure from Melbourne, through the violation by Great Britain of her international duty, were claims for which the owners of the property destroyed were justly entitled to compensation from Great Britain, although they could not obtain their rights in tne ordinary course of judicial proceedings, but only by petition to the British government, or through

the interposition of their own government. Compensation for those losses was demanded by the United States from Great Britain as a matter of right, and as such was awarded by the decision of the Tribunal of Arbitration created by the treaty between the two governments. The act of Congress for the adjudication and disposition of the moneys received from Great Britain, pursuant to that decision, provided for their application to the payment of claims directly resulting from the damage caused by those insurgent cruisers ; and the sum awarded to this defendant by the commissioners appointed under that act of Congress was upon such a claim. It must therefore be treated as awarded and paid to him by reason of his interest in property so destroyed, and of his right to compensation for its destruction, and as capable of passing by an assignment from him, in any form recognized by law, though made after the destruction of the property and before the award of indemnity.

In the case at bar, as in those in the Supreme Court of the United States and in the English Court of Chancery, already quoted, the duties required of the commissioners, and the powers conferred upon them, are confined to ascertaining the validity and amount of the claims for damages incurred by the destruction of vessels and cargoes ; and the investigation and determination of conflicting rights, under assignments or otherwise, in the sums awarded by the commissioners, are left to the ordinary course of judicial proceedings. The object of § 12 is to define and limit the claims which may be recovered against the United States under this act. Whether and how far its provisions may affect suits between underwriters and assured, to enforce rights arising out of the contracts between them, is not before us. It is quite clear that it does not affect interests of assignees claiming under an assignment, whether voluntary or by operation of law, as to which Congress has made no regulation.

The question then remains, whether the right to the money received by the defendant was included in the previous assignment of his estate in bankruptcy.

The decision upon this point in *Comegys* v. *Vasse* was based mainly upon §§ 5 and 6 of the bankrupt act of 1800, which provided that the commissioners in bankruptcy should take into their possession " all the estate, real and personal, of every nature

and description, to which the said bankrupt may be entitled, either in law or equity, in any manner whatsoever," and "all deeds and books of account, papers and writings, belonging to such bankrupt;" and should assign to the assignees in bankruptcy "all and singular the said bankrupt's estate and effects aforesaid, with all muniments and evidences thereof." 2 U. S. Sts. at Large, 23. Mr. Justice Story, in delivering judgment, said: "These words are certainly very general and comprehensive. 'All the estate, real and personal, of every nature and description, in law or equity,' are broad enough to cover every description of vested right and interest, attached to and growing out of property. Under such words, the whole property of a testator would pass to his devisee. Whatever the administrator would take, in case of intestacy, would seem capable of passing by such words. It will not admit of question, that the right devolved upon Vasse, by the abandonment, would, in case of his death, have passed to his personal representative, and, when the money was received, be distributable as assets. Why then should it not be assets in the hands of the assignees? Considering it in the light in which Lord Hardwicke viewed it, as an equitable trust in the money; it is still an interest, or, at all events, a possibility coupled with an interest." 1 Pet. 218, 219.

Although the learned judge also referred to the provisions of § 18, respecting the surrender by and the examination of the bankrupt with regard to effects and papers in which he was in any way interested or entitled, or had or might "have or expect any profit, possibility of profit, benefit or advantage whatsoever," as very material, yet his observation, "If there were any doubt upon the meaning of the language of the fifth section, we think it is cleared up and illustrated by that of the present," as well as his previous commentary on § 5, and the subsequent decisions in *United States* v. *Hunter*, 5 Mason, 62, and 5 Pet. 173, and in *Milnor* v. *Metz*, 16 Pet. 221, giving the like effect to assignments under state insolvent laws, clearly show that an assignment, in general terms, of all a debtor's property and estate, for the benefit of his creditors, must be considered as including the right in question.

The words of the recent bankrupt act are more full and particular in this respect than those of the act of 1800. It provides

that the judge or register shall assign and convey to the assignee in bankruptcy " all the estate, real or personal, of the bankrupt, with all his deeds, books and papers relating thereto," " and thereupon, by operation of law, the title to all such property and estate, both real and personal, shall vest in said assignee," excepting only furniture and other necessary articles, not exceeding in all $500 in value, wearing apparel, military uniform, arms and equipments, and property "exempted from attachment, or seizure, or levy on execution," by the laws of the United States, or of the state of the bankrupt's domicil. This last exception clearly has regard to such property as, if not specifically exempted, would be capable of being seized or taken on attachment or execution, and has no application to rights or interests which from their nature are incapable of being so seized or taken. The act then goes on to provide that " all rights in equity, choses in action, patents and patent-rights and copyrights ; all debts due him or any person for his use, and all liens and securities therefor ; and all his rights of action for property or estate, real or personal, and for any cause of action which the bankrupt · had against any person, arising from contract, or from the unlawful taking or detention of or injury to the property of the bankrupt, and all his rights of redeeming such property or estate ; with the like right, title, power and authority to sell, manage, dispose of, sue for, and recover or defend the same, as the bankrupt might or could have had if no assignment had been made ; shall, in virtue of the adjudication of bankruptcy and the appointment of his assignee, be at once vested in such assignee." U. S. St. March 2, 1867, § 14. U. S. Rev. Sts. §§ 5044, 5045, 5046.

In the light of the decisions under former bankrupt and insolvent laws, we cannot doubt that these words were intended to include every kind of vested interest, legal or equitable, in, and all claims, whether founded in contract or in tort, relating to or growing out of property — which the debtor himself, if not adjudged a bankrupt, could in any way assign, or could prosecute in any form, either in the ordinary courts of justice, or otherwise.

The act of Congress of February 26, 1853, requiring assignments of any claim upon the United States to be executed in the

presence of two witnesses, and after the allowance of the claim, the ascertainment of the amount due and the issue of a warrant for its payment, manifestly applies only to voluntary assignments *in pais*, and not to assignments by operation of law and in the course of judicial proceedings.

It is equally clear that the interest of the bankrupt in the property destroyed by the insurgent cruiser, and his claim against any individual or government for compensation for such destruction, were not included in the "choses in action, consisting of certain bills, notes and accounts, nominally of the value of about one thousand dollars, but in reality nearly worthless," which the assignee in bankruptcy has sold under an order of the District Court of the United States.

No reference was made at the argument, under the leave reserved in the bill of exceptions, to the publications of the Department of State or the debates in Congress, relating to the Geneva Arbitration and Award.

The result is, that the money paid by the United States to the defendant may be recovered in this action as money had and received to the plaintiff's use.   *Law* v. *Thorndike*, 20 Pick. 317. *Lee* v. *Thorndike*, 2 Met. 313.            *Exceptions overruled.*