JOHN HEARD & others *vs*. JAMES STURGIS & another, assignees.

Suffolk.   November 11, 1887. — April 25, 1888.

Present : MORTON, C. J., DEVENS, FIELD, W. ALLEN, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Alabama Claims — War Premiums — Gift — Bankruptcy — Assignee.*

Money paid by the United States, out of the Geneva Award, under the U. S. St. of June 5, 1882, for the reimbursement of war premiums paid from 1861 to 1865, constitutes a gift to one who paid such premiums, and will not pass to his assignee in bankruptcy under an assignment made in 1875. — FIELD & W. ALLEN, JJ., dissenting.

CONTRACT for money had and received.   The case was submitted to this court upon an agreed statement of facts, in substance as follows.

The plaintiffs, citizens of the United States, were engaged between April 13, 1861, and April 9, 1865, as partners, under the firm name of Augustine Heard & Co., in the business of buying and shipping steamers for China, of receiving and selling merchandise from China, and of insuring merchandise and vessels.   During that period the plaintiffs bore true allegiance to the government of the United States, and after the sailing of the first Confederate cruiser paid in the course of their business certain enhanced payments of insurance, otherwise called payments of premiums for war risks, or war premiums, on such merchandise and vessels.

On May 31, 1865, the firm of Augustine Heard & Co. was dissolved by the agreement of the members thereof.   On August 5, 1875, the plaintiffs were severally adjudicated bankrupts in the United States District Court for the District of Massachusetts ; on September 11, 1875, assignments in bankruptcy in the usual form were made to the defendants; and on July 20, 1877, the plaintiffs received their discharge in bankruptcy. The firm, and each of the plaintiffs individually, were solvent when it was dissolved, and all the debts owed by the plaintiffs at the time of their adjudication in bankruptcy were incurred after the dissolution.   The estate of the bankrupts received by

the defendants hitherto has proved insufficient to pay in full the debts of the bankrupts.

In December, 1886, an award was made by the Court of Commissioners of Alabama Claims to the defendants, as assignees in bankruptcy of the plaintiffs, in proceedings in that court to which the plaintiffs were parties, on account of such payments of war premiums by the plaintiffs, and was in part paid to the defendants by the United States, the amount of the Geneva Award unappropriated being insufficient to pay the war premium awards in full. Of the sum so awarded and paid, there remained in the hands of the defendants, after paying the reasonable expenses of prosecuting the claim before the Court of Commissioners of Alabama Claims and collecting the award, the sum of $13,612.85.

The Treaty of Washington between the United States and Great Britain, promulgated July 4, 1871; the decisions rendered by the Tribunal of Arbitration at Geneva, and the final decision and award made by that tribunal, on September 18, 1872; the acts of Congress of June 23, 1874, and of June 5, 1882, respectively, creating and re-establishing the Court of Commissioners of Alabama Claims; and the several acts of Congress relating to that court and the payment of its awards, are to be treated as facts in this case, and may be referred to at the argument.

No controversy or question existed between the parties as to the proportions in which the plaintiffs were entitled, if at all, to the sum recovered, or as to its distribution. If, upon the facts, the plaintiffs were entitled to recover, judgment was to be entered for them, and the case was to stand for the assessment of damages; otherwise, judgment for the defendants. In either event, the expenses of this action and reasonable counsel fees to each party to be paid out of the fund.

The case was argued at the bar in November, 1887, and afterwards was submitted on the briefs to all the judges.

*H. W. Putnam*, for the plaintiffs.

*C. A. Williams*, for the defendants.

Holmes, J. The plaintiffs in this case are parties who paid enhanced premiums for insurance on war risks from 1861 to 1865. The defendants are their assignees in bankruptcy, under an assignment made in 1875. They have received money from

the United States, according to a decision of the Court of Commissioners of Alabama Claims under the act of Congress of June 5, 1882, in respect of the war premiums paid by the plaintiffs; and the question is whether they are entitled to hold that money under the assignment, which it will be noticed was made before the act was passed, by force of which the money was paid by the United States.

It is settled that the adjudication of the commissioners is not conclusive between the parties. That adjudication only decides upon the amount and validity of the claim as against the United States, sets apart and identifies the fund for the benefit of whoever ultimately may prove entitled to it under the proper construction of the statute, and leaves the rights of all persons claiming to be entitled to the sum awarded to the ordinary course of proceeding in the established courts. *Leonard* v. *Nye*, 125 Mass. 455, 466. *Comegys* v. *Vasse*, 1 Pet. 193, 212. The Court of Commissioners have expressed and acted on this view of the law. *McLeane* v. *United States*, Davis's Report of Decisions of Commissioners, 112. 44th Cong. 2d Sess. Senate Ex. Doc. No. 21. *The Bankruptcy Question*, March, 1884, in Rules, Opinions, &c. of Court of Comm. of Ala. Claims, Washington, 1885. The only question is whether the right of the defendants is equally established by *Leonard* v. *Nye* and *Comegys* v. *Vasse*, or whether there is a satisfactory distinction to be taken between those cases and the case at bar.

There is no need of stating in detail well-known cases in easily accessible reports. It is enough to say, that the American decisions establish that when this government collects a sum from a foreign government in respect of wrongs to our citizens, and subsequently passes a law to distribute the fund collected to the parties wronged, this government is to be regarded as having stood from the beginning *quasi* in the position of an agent to collect on behalf of its subjects, and a trustee of the fund when collected, and thus that the payment when made is to be treated as if made in pursuance of a duty on its part, and in satisfaction of a vested right of the subject, and not as a pure gratuity and gift. *Comegys* v. *Vasse*, and *Leonard* v. *Nye*, *ubi supra*. *Bachman* v. *Lawson*, 109 U. S. 659, 663. *Gracie* v. *New York Ins. Co.* 8 Johns. 237, 245. So as to claims against the

government for proceeds of captured property. *Erwin* v. *United States*, 97 U. S. 392. It follows from this view, and it is decided, that such claims pass to an assignee in bankruptcy or insolvency under an assignment earlier in date than the act providing for the payment of the claims. *Leonard* v. *Nye, ubi supra. Jones* v. *Dexter*, 125 Mass. 469. *Comegys* v. *Vasse, ubi supra. Phelps* v. *McDonald*, 99 U. S. 298. *Plater* v. *Scott*, 6 Gill & J. 116.

We are bound by these decisions as far as they go. Undoubtedly, if the acts with which they deal had been in force before the respective assignments, no one would have felt any hesitation about the result merely by reason of his opinions as to the relations of subject and sovereign, or the impossibility of the former having a right in a strict juridical sense against the latter; and perhaps it would not have mattered whether the sum given by the act was a pure gratuity, or was founded upon a moral consideration, so long as the government positively undertook to pay. Compare *Ex parte Huggins*, 21 Ch. D. 85; *Ex parte Webber*, 18 Q. B. D. 111. Undoubtedly, too, an act may be passed at any time providing expressly or by implication that the sums distributed shall be paid to the use of such persons as would have been entitled at the time of payment, if the claims forming the moral consideration of the statute had been legal claims from the beginning. Furthermore, there is a very intelligible reason for giving that effect to a statute which distributes a fund, collected as we have supposed, to sufferers in respect of whose sufferings the claim was collected. The commercial and practical, rather than strictly juridical, light in which we are in the habit of regarding the sovereign power, makes it natural and easy to adopt such a view.

But it must be remembered, whenever a new statute comes up for consideration, that although it may be found by construction to give what it gives as if in pursuance of a legal duty, there is no such legal duty in fact, and no antecedent right on the part of the persons who receive its benefits. It is only tautologous to say that the law knows nothing of moral rights unless they are also legal rights, and from before the days of Hobbes the argument has been public property that there is no such thing as a right created by law, as against the sovereign who makes the law by which the right is to be created. *Bur-*

*nand.* v. *Rodocanachi,* 7 App. Cas. 333, 336. Hobbes, De Cive, c. 6, § 14 (Op. Lat. ii. 227) ; Leviathan, c. 26 (Eng. Works, iii. 250–252). Sir John Eliot, De Jure Maiestatis, c. 3. Bodin. De Republica, I. c. 8. Bentham, Fragment on Government, c. 5 (Works, i. 292, 293). Austin, Jurisprudence, Lect. 6, pp. 286, 287 (3d ed.).

In every case, then, some reason must be found, either in the words of the distributing statute, or in what we have called the moral consideration for it, as that the fund if received by a private person would have been charged with a trust, or that the sovereign but for his sovereignty would be bound to indemnify the distributees for some previous loss, before the distribution can be regarded as anything more than a simple gift.

In the present case there is no pretence that the United States received the money paid over by the Geneva Award upon any trust in favor of those who paid war premiums, even in the attenuated sense in which it may be said to have done so for those whose vessels were destroyed by the Alabama, &c. On the contrary, claims for war premiums, as such, were expressly withdrawn from the consideration of the Geneva tribunal. Protocols 5, 6, and 7 of the Conferences of the Arbitrators. Message and Documents, Department of State, Part 2, Vol. IV., 1872–73, pp. 19–22. The corner-stone of the decision in *Leonard* v. *Nye* is wanting. The ground on which that case went may be seen from the following extract from the opinion :

" The claims for the destruction of property of citizens of the United States by the Alabama and the Florida, and by the Shenandoah after her departure from Melbourne, through the violation by Great Britain of her international duty, were claims for which the owners of the property destroyed were justly entitled to compensation from Great Britain, although they could not obtain their rights in the ordinary course of judicial proceedings, but only by petition to the British government, or through the interposition of their own government. Compensation for those losses was demanded by the United States from Great Britain as a matter of right, and as such was awarded by the decision of the Tribunal of Arbitration created by the treaty between the two governments. The act of Congress for the adjudication and disposition of the moneys received from Great Britain, pursuant

to that decision, provided for their application to the payment of claims directly resulting from the damage caused by those insurgent cruisers ; and the sum awarded to this defendant by the commissioners appointed under that act of Congress was upon such a claim.   It must therefore be treated as awarded and paid to him by reason of his interest in property so destroyed, and of his right to compensation for its destruction, and as capable of passing by an assignment from him, in any form recognized by law, though made after the destruction of the property and before the award of indemnity." 125 Mass. 465, 466.

This language follows the same lines as *Comegys* v. *Vasse*, and marks the limit beyond which we cannot go.

We do not understand it to be argued that the plaintiffs had any claim against the United States government for indemnity irrespective and outside of a claim sounding in trust against the fund received from Great Britain, so that apart from trust the allowance made by the statute should be construed as recognizing a pre-existing obligation.   The allowance is in respect of war premiums generally.   It is not confined to those which possibly might found a claim by way of subrogation to the insurer on the ground that the premiums were paid to mutual companies and were used to pay losses.   Inasmuch as presumably the cost of the war premiums in general ultimately fell upon the purchasers of insured goods, a claim against the government for indemnity in respect of them would resolve itself finally into a claim of all the members of the community for increased cost of living on account of the war.

If the plaintiffs had no claim for indemnity against the United States, it is not material whether they had a claim against Great Britain or not, so long as no part of the fund received by the United States was paid in respect of any such claim.   But it may be noticed that the Geneva tribunal, certainly a respectable authority, expressed the opinion " that these claims do not constitute, upon the principles of international law applicable to such cases, good foundation for an award of compensation or computation of damages between nations, and should, upon such principles, be wholly excluded from the consideration of the tribunal in making its award." Protocol 5, *ubi supra*.   Even if the United States had not yielded to this opinion, but still

asserted a liability on the part of Great Britain, such an assertion would not be equivalent to an assertion of its own liability to indemnify its citizens. And as it certainly never has admitted such a liability, and as it has received no money from Great Britain in respect of the claim, there are no grounds outside the words of the act of June 5, 1882, for saying that it recognizes a pre-existing right against the United States on the part of all who paid war premiums.

The decisions to which we have adverted do not go on the language of the statutes which were under discussion, but upon the nature of the claims forming what we have called the moral consideration for the respective acts. There is nothing decisive in the language of the act before us, but the circumstances and the words used are at least as favorable to the view that this payment of war premiums. was by way of gratuity, as to any other. The act was not passed until the persons whose claims were within the scope of the Geneva Award had been satisfied, and dealt with a surplus left over from the sum in gross awarded. Claims under the act for war premiums are subordinated to claims for destruction of property; and it may be noticed for what it is worth, that, while the act of June 23, 1874, § 12, provides for deducting compensation or indemnity received by the party injured or his assignees, the act of June 5, 1882, § 6, does not mention assignees, and does not use the word "compensation," but only "indemnity, dividend, set-off," &c., possibly indicating a recognition that the "claims" upon the Alabama fund created by the statute were claims in respect of which no one ever had had a right to compensation, and which had never passed by an assignment, because they had no existence until the statute created them. This construction is helped by the well-known fact that Congress hesitated long between several competing applicants for a share in the surplus fund, including the insurance companies and the Treasury itself.

If the sum in controversy was a pure gift to the plaintiffs, to which they had no claim as of right in any sense, it did not pass to their assignees. *Emerson* v. *Hall*, 13 Pet. 409. *Gillan* v. *Gillan*, 55 Penn. St. 430. Even if assignees in bankruptcy are universal successors, they succeed only to the rights and interests which the bankrupt has at the time, not, of course, to anything

which he afterwards may acquire by a title wholly subsequent. U. S. Rev. Sts. § 5044. Executors stand in a different position. They " represent the person of the testator." St. 9 Ed. III. st. 1, c. 3. Littleton, § 337. *Overton* v. *Sydall*, Poph. 120, 121 ; *S. C.* Gouldsb. 120, pl. 6. *Boyer* v. *Rivet*, 3 Bulstr. 317, 321. *Bain* v. *Cooper*, 1 Dowl. Pr. Cas. (N. S.) 11, 14. They would take, if their testator had died before the act of 1882 was passed ; and if the will contained a residuary clause, it might be construed to apply to the sum received by them as representing him, in accordance with the rule laid down by Lord Hardwicke in *Green* v. *Ekins*, 2 Atk. 473, 476, that, " if the personal estate is increased by any event after the death of the testator, it is part of the residue, and will pass as such." *Grant* v. *Bodwell*, 78 Maine, 460, 465. *Pierce* v. *Stidworthy*, 79 Maine, 234. Our decision is in accordance with *Brooks* v. *Ahrens*, 68 Md. 212, and *Taft* v. *Marsily*, 47 Hun, 175.                    *Judgment for the plaintiffs.*

FIELD, J. I cannot assent to the opinion of the court.

It is said that the plaintiffs in the case at bar had no right or property in any claim to be repaid the war premiums paid by them until this right or property was created by the act of Congress of June 5, 1882 ; that Great Britain paid no money to the United States on account of war premiums ; that no trust in any sense in favor of the plaintiffs attached to the money received under the Geneva Award ; and that therefore in 1875, when the plaintiffs became bankrupts, and an assignment of their property in the usual form was made to the defendants as their assignees, the plaintiffs had no property in the claim which could pass under the assignment.

In *Leonard* v. *Nye*, 125 Mass. 455, the defendant was adjudged a bankrupt in February, 1868, and in January, 1875, he presented a claim to the Court of Commissioners of Alabama Claims for damages sustained by the destruction of merchandise by the insurgent cruiser Shenandoah, after her departure from Melbourne, and a sum of money was awarded to him as damages on April 5, 1876, which was paid him on September 15, 1876 ; and the plaintiff, being the defendant's assignee in bankruptcy, recovered it in the action. It is said in the opinion, at page 466, that although the assignment in bankruptcy was

before the Treaty of Washington, and before the passage of the act of Congress of June 23, 1874, yet the money must "be treated as awarded and paid to him by reason of his interest in property so destroyed, and of his right to compensation for its destruction, and as capable of passing by an assignment from him, in any form recognized by law, though made after the destruction of the property and before the award of indemnity." The distinction taken between that case and this is, that the money paid by Great Britain was paid and received as compensation for the destruction of property, in which was included the property of the defendant in *Leonard* v. *Nye*, but was not paid or received as compensation for the war premiums which the plaintiffs in the case at bar had paid. The case of *Leonard* v. *Nye* states the settled law of the United States as to money paid to claimants under the act of June 23, 1874, and other similar statutes. *Comegys* v. *Vasse*, 1 Pet. 193. *United States* v. *Hunter*, 5 Mason, 62; *S. C.* 5 Pet. 173. *Frevall* v. *Bache*, 14 Pet. 95. *Milnor* v. *Metz*, 16 Pet. 221. *Erwin* v. *United States*, 97 U. S. 392. *Phelps* v. *McDonald*, 99 U. S. 298. *Bachman* v. *Lawson*, 109 U. S. 659.

The decision of the House of Lords in *Burnand* v. *Rodocanachi*, 7 App. Cas. 333, is clearly the same as would have been rendered here, whatever criticisms might be made upon some of the language found in the opinions.

The money awarded under the act of June 23, 1874, or under that of June 5, 1882, was perhaps, in a strict legal sense, a gift by the United States, because the United States were under no legal obligation to pay the money received from Great Britain to any one. Neither was Great Britain in the matter of the Alabama claims under any legal relations to citizens of the United States. *United States* v. *Diekelman*, 92 U. S. 520, 524. But governments often recognize obligations towards each other, or towards their own citizens, or towards the citizens or subjects of foreign states, which are analogous to the obligations enforced in judicial courts between litigants. To what extent they will do this, when they will follow and when depart from the rules which prevail in judicial courts, is in the discretion of the sovereign power, and in the case at bar it must be determined from the acts of Congress whether the money thereby appropri-

ated was intended as a gratuity, or as compensation for services rendered or for money paid, or for property lost, taken, or destroyed. *Milnor* v. *Metz, ubi supra.*

It is apparent, I think, that Congress, in enacting the St. of June 5, 1882, as well as that of June 23, 1874, did not intend that the money appropriated to claimants under these acts should be a gratuity, because it is appropriated on account of a loss of property, and as compensation for the loss, for which claim had been made from a time anterior to the Treaty of Washington. If the United States had submitted the distribution of the fund received from Great Britain to the judicial courts without any directions other than those which the rules of municipal jurisprudence afford, it may be that the fund would have been distributed among the owners of property destroyed by the inculpated cruisers, or the representatives or assigns of such owners, and that insurance companies which had paid a loss would have been subrogated to the rights of the assured. But Congress saw fit to give explicit directions in regard to the appropriation of the money in both the St. of June 23, 1874, and in the St. of June 5, 1882. Neither of these statutes deals with any money except that received from the Geneva Award, and Congress by these statutes has in fact appropriated it all to the payment of claims for the loss of property, and for the expenses of the Court of Commissioners of Alabama Claims; and Congress was the only tribunal competent to determine to whom, and in what manner, if at all, the money should be appropriated and the claims satisfied. If Congress intended by these statutes to appropriate the money to certain persons as a gratuity, the only matters for the Court of Commissioners to deal with would have been the persons intended by the statutes, and the amounts given to each, and it is difficult to see how a judicial court could re-examine the distribution made by the Court of Commissioners unless the persons to whom that court awarded the money claimed and received it in some representative capacity. The judicial courts determine the ownership of the money awarded only on the ground that it follows the ownership of the property as compensation for which the awards were made. Congress did not, however, in these statutes, specify the persons entitled to receive the money

otherwise than by describing the claims to be admitted, except that it provided for the exclusion of claims for the loss of property insured to the extent of the indemnity received from the insurance, and that no claim should be allowed " in favor of any person not entitled at the time of the loss to the protection of the United States in the premises," nor " in favor of any person who did not at all times during the late rebellion bear true allegiance to the United States."

The Court of Commissioners of Alabama Claims were, under the St. of June 23, 1874, § 11, to adjudicate upon all claims admissible under the act " directly resulting from damage caused by the " inculpated cruisers, and under the St. of June 5, 1882, § 5, upon claims "directly resulting from damage done on the high seas by Confederate cruisers during the late rebellion," and " claims for the payment of premiums for war risks." Under each of these statutes the Court of Commissioners held that the persons to present the petitions were the persons who owned the property damaged, or who had paid the war premiums, or their personal representatives if they were dead, or their assigns if the claims had been assigned either by voluntary conveyance or by operation of law, although an assignee might prosecute the claim in the name of the assignor, or the assignor might prosecute it if the assignee did not intervene. The practice and proceedings under which assignees in bankruptcy were admitted as claimants were established under the St. of June 23, 1874, being c. 459 of the acts that year, and were well known when the St. of June 5, 1882, was passed, and the latter statute provides, in § 4, "that the practice and proceedings established and directed by said chapter four hundred and fifty-nine shall be followed and had in regard to all claims provable under this act, and it shall be the duty of the said court hereby re-established in the mode, and subject to all the conditions, limitations, and provisions of said chapter four hundred and fifty-nine, except as changed and modified by this act, to receive and examine the claims mentioned in section five of this act," &c.

The claimants for property destroyed, and for war premiums paid, both made their claims originally on the grounds of natural justice and international obligation; but until the treaty, the rules by which the conduct of Great Britain was to be

tested were in dispute between the governments, and the fact that Great Britain had violated those rules was first conclusively established by the Geneva Award. It was for the United States to determine on what trusts, if any, they received the money, and to appropriate it as they saw fit, and it is not competent for this court to decide whether Congress in fact rightly appropriated it or not. If the acts of Congress appropriated the money to certain persons as a gratuity, the awards of the Court of Commissioners of Alabama Claims must be held by the judicial courts as gifts; but if these acts appropriated the money as a compensation for the loss of property, the judicial courts must so treat the awards. The legal connection between the awards and the money received from Great Britain, or the awards and the money appropriated by the United States, is established by the acts of Congress, construed in connection with the subject and the circumstances, and not by any opinion of a moral equity not recognized by the acts.

The question whether any distinction could be recognized between claims under the St. of June 23, 1874, and claims under the St. of June 5, 1882, in reference to the rights of assignees in bankruptcy, or assignees under voluntary assignments, was presented before the Court of Commissioners of Alabama Claims, and it was decided in an elaborate opinion that no distinction could be made. It was said in the opinion, that "Neither of the acts can properly be regarded as creating a bounty for these claimants. Both alike were the acts of the sovereign state dispensing justice, and not distributing alms to its citizens. . . . . Our government had always insisted that all these claims were just demands upon Great Britain, and the acts of 1874 and 1882 reaffirmed that position, and provided a way by which all these sufferers alike might be reimbursed to the extent of the fund awarded at Geneva, giving the preference to those who had sustained direct losses. And this recognition of the right of the claimants in this fund must be held to relate back to the time when their losses occurred." French, J., in *The Bankruptcy Question*, March, 1884, in Rules, Opinions, &c. of Court of Comm. of Ala. Claims, Washington, 1885.

A similar question arising in the administration of the estates of deceased persons has been decided in the same way, and for

the same reasons, by the Supreme Judicial Court of Maine, in *Grant* v. *Bodwell*, 78 Maine, 460, and in *Pierce* v. *Stidworthy*, 79 Maine, 234. The Supreme Court of New York, in *Taft* v. *Marsily*, 47 Hun, 175, and the Court of Appeals of Maryland, in *Brooks* v. *Ahrens*, 68 Md. 212, decided that the money appropriated by the act of 1882 was a gratuity, and that no claim existed before the passage of the act which would pass to assignees in bankruptcy. In the opinions in these last two cases *Emerson* v. *Hall*, 13 Pet. 409, is cited as authority.

In *Emerson* v. *Hall*, Chew, Emerson, and Lorrain were respectively collector, surveyor, and naval officer of the port of New Orleans, and they seized and procured the condemnation of the Brig Josepha Secunda for an infraction of the laws against the slave trade, and by the District Court they were allowed one half of the proceeds. This part of the decree was reversed by the Supreme Court of the United States, on the ground that the statutes giving one half of the proceeds of condemned property to the seizing officers did not apply to such a case. The seizure was in 1818. In 1828 Emerson died, leaving heirs. On March 3, 1831, Congress passed an act entitled " An Act for the relief of Beverly Chew, the heirs of William Emerson, deceased, and the heirs of Edward Lorrain, deceased." The act directed the District Court to pay over the one half of the proceeds " to the said Beverly Chew and the legal representatives of the said William Emerson and Edward Lorrain respectively." A part of this money was received by the minor children of Emerson as his legal representatives, and the suit was to compel the tutor and curator of these children to pay out of this money a judgment which had been recovered against Emerson in his lifetime. The court held that it was a gift by Congress, that the act intended that the money should be paid to the heirs of Emerson, as the persons designated in the act as his legal representatives. The language of the act of Congress, as construed by the court, shows that it was not the intention of Congress that the money should be paid as a part of the estate of Emerson, but should be given to his heirs.

In *Milnor* v. *Metz*, 16 Pet. 221, Milnor and Thompson had been gaugers at the port of Philadelphia for the years 1836 and 1837, upon a salary of $1,500 a year. The act of July 4, 1836,

reduced the duties on wines, under which they were required to regauge the wines. They presented a memorial to Congress in January, 1838, for extra pay for their services. In December, 1838, Milnor applied for the benefit of the insolvent laws of Pennsylvania, and in accordance with these laws he executed an assignment of his property, on January 11, 1839, and he mentioned this claim against the United States in the statement of his property which he was required to make; he received his discharge in the same January. Congress, on May 2, 1840, passed an act "that the Secretary of the Treasury be, and is hereby, directed to pay to Robert Milnor and John Thompson the sum of two thousand seven hundred and fifty-seven dollars and twenty-three cents, being the amount of fees equitably due" to them for extra services, &c. 6 U. S. Sts. at Large, 798. Metz, the assignee in insolvency of Milnor, made no claim before Congress, but after the act he claimed one half of the amount (it being admitted that Milnor's share was one half); his claim being rejected, thereupon he brought suit against the Secretary of the Treasury, Milnor, and others, and the court held that the money belonged to the assignee.

I cannot distinguish the principles which should govern the case at bar from those declared in *Comegys* v. *Vasse*, and the other cases cited. I think that the claim of the plaintiffs was a claim growing out of and relating to property; that it has been so treated by Congress in the act of June 5, 1882; that the money appropriated by Congress was appropriated in satisfaction of this claim; and that the money awarded is a part of the estate of the plaintiffs which passed to the assignees under the assignment in bankruptcy.

Mr. Justice William Allen concurs in this dissent.